## FLOOR v. JOHNSON, et al.

No. 7141.   Decided November 4, 1948.   (199 P. 2d 547.)

See 18 C. J. S., Corporations, sec. 249; 13 Am. Jur. 966. Removal by court of director or officer of private corporation, note, 124 A. L. R. 364.

*McKay, Burton & White, Richard S. Johnson,* and *Hugh J. Hintze,* all of Salt Lake City, for appellants.

*Critchlow & Critchlow, Jensen & Richards,* and *E. C. Jensen,* all of Salt Lake City, for respondent.

PRATT, Justice.

This is a suit in equity, commenced February 2, 1946, in which the plaintiff Nick Floor, on behalf of himself and

all other stockholders of the New Quincy Mining Company similarly situated, sought to have cancelled and set aside some 200,000 shares of New Quincy Mining Company stock alleged to have been fraudulently issued for voting purposes; to enjoin future voting or sale thereof and to have certain named individuals declared elected as directors of the New Quincy Mining Company, in place of those sued as defendants, whose election was founded upon a majority vote computed with the 200,000 shares in issue.

The action as originally commenced was only against M. B. Johnson, S. B. Tuttle, New Quincy Mining Company, a corporation, and J. C. Johnson, individually and as trustee. Thereafter by amendment the other defendants were included, together with that part of the prayer pertaining to the election of officers.

The evidence discloses that in recent years the New Quincy Mining Company stockholders have been more or less divided into two groups. One group, headed and allegedly controlled by M. B. Johnson, has been in control of the Corporation for a number of years. S. B. Tuttle, a member of this group, has been President of the Company for several years. M. B. Johnson has served as director and also is Secretary and Treasurer. In addition, M. B. Johnson also has served as general manager of the Company. For convenience, we shall call this group the Johnson group.

The other group, headed by Nick Floor, hereafter called the Floor group, has heretofore been unable to muster a sufficiently large vote to oust the Johnson group from office. For two years preceding 1946 at the regular elections sufficient stock was not represented at the meetings to hold a vote, and for this reason the incumbent Johnson group continued to control the Company. Nick Floor having become dissatisfied with the directors' actions was active during all this time in the solicitation of proxies, in an effort to oust the Johnson group. At a special stockholders' meeting in July, 1945, he had amassed 409,815 votes, either

by personal representation or by proxy, out of a then total stock issue of 914,881 shares, falling only slightly short of a majority. During 1945 he renewed his efforts and as indicated by the tally sheets at the election meeting held January 22, 1946, had present 483,376 votes, represented either personally or by proxy.

At the January 22nd meeting in 1946, the total outstanding shares had been increased however, and the Johnson group had present, either personally or by proxy, 620,207 votes, which included the 200,000 shares in question. The Johnson group directors on the basis of such majority of votes declared themselves elected.

The Floor group contends that votes representing 200,000 shares of stock should not have been included for reasons hereafter stated, and that without the 200,000 votes the Floor group had a majority present, which majority would, if the 200,000 shares had not been counted, have elected them to office. Proceeding on this theory the Floor group thereafter took and filed oaths of office and declared themselves elected as directors and proceeded to organize their board of directors.

Now as to the transactions involving the increase of 200,000 shares of stock: On January 12, 1946, just 10 days before the election, at a board of directors' (Johnson group) meeting it was proposed that 200,000 shares of capital treasury stock be sold to F. F. Hintze and the Empire Canyon Mining Company of which Hintze was president, at ten cents per share. No formal action was taken at that time. On January 19, 1946, final drafts of the agreements were considered and authorized by the directors (the Johnson group) of the New Quincy Mining Company. The contracts dated January 10, 1946, and as finally entered into though not identical in wording are in substance the same, the difference being such as was made necessary by the fact that Mr. Hintze was to pay a cash down payment, while the Empire Canyon Mining Company was to transfer property as a down payment. We quote the latter contract:

316

"Stock Sale Agreement

"This Agreement entered into this 10th day of January, 1946, by and between NEW QUINCY MINING COMPANY, Party of the First Part, and Empire Canyon Mining Company, Party of the Second Part,

WITNESSETH:

"Whereas, the party of the first part has among its assets 100,000 shares of Treasury stock, and

"Whereas, the party of the second part has submitted to said corporation an offer for said stock in the sum of $10,000.00, being at ten cents per share, and said purchase price to be paid in the amounts and at the times hereinafter set forth, and

"Whereas, the said party of the first part desires to provide a fund from which it may redeem 38 acres of mining ground in Wasatch County, Utah, as provided by the terms of that certain agreement between the party of the first part and the Park Utah Mining Company, or in the event said redemption is not made with these funds, then said money is to be disposed of as the Board of Directors of the party of the first part shall direct, and this agreement and sale of stock having been authorized by a resolution passed and signed by more than four members of the Board of Directors of the party of the first part,—

"Now, Therefore, the party of the second part hereby agrees to purchase, the party of the first part agrees to sell 100,000 shares of Treasury stock for the sum of Ten Thousand Dollars ($10,000.00) upon the following terms and conditions, to wit:

"1. The party of the second part agrees to pay the sum of Five Thousand Dollars ($5,000.00) upon the execution of this contract, the receipt of which is hereby acknowledged, by the transfer to the said Trustee for the benefit of the party of the first part of a duly executed bill of sale conveying title to the party of the first part to all of the equipment of the party of the second part now located upon the premises leased from the party of the first part by the party of the second part, said property being generally: compressors, motors, cables, controls, valves, hoist, harnesses, etc., and it being hereby agreed by the said parties that the sum of $5,000.00 is the fair and reasonable value of said equipment installed on the premises. Thereafter, party of the second part shall pay and apply a sum equal to the difference between the per cent required to be paid by said party of the second part under and by virtue of the lease, or modification thereof, which party of the second part now has with party of the first part, and a sum representing 50% of the net smelter returns from ore shipped under and by virtue of said lease. It is understood and provided that the said percentages of the net smelter returns shall be paid immediately upon receipt of payment from the smelter

by party of the second part, these payments to continue until the balance has been paid in full.

"2. Immediately upon the execution of this contract, and payment of the $5,000.00 as herein provided, the party of the first part hereby agrees to issue and deliver two certificates of stock for 50,000 shares each, representing said 100,000 shares of Treasury stock, to J. C. JOHNSON, as Trustee, said stock to be issued in the name of the trustee and to be held by the said trustee, until the balance of the purchase price as herein provided shall have been paid, and upon the payment in full of the purchase price as herein provided, said shares of stock are to be endorsed and delivered to the party of the second part, it being understood and provided that J. C. Johnson said trustee, shall at all times and until the balance of the purchase price herein is paid, have the full voting right for said stock, and which right shall continue as aforesaid until this contract is by its terms terminated, it being understood and agreed that the stock herein issued to the trustee is upon delivery of bill of sale for down-payment herein provided and by the terms of this agreement paid for, and is entitled to be voted in all corporate affairs of the said party of the first part. It being further understood that the party of the second part herein may assign its right, title and interest in this contract and the stock herein provided to other parties to complete this contract, and that the trustee herein may accept for this purpose such other or substitute parties to complete the contract.

"3. All funds herein provided are to be paid, including the down-payment to J. C. Johnson, as trustee, who shall keep and retain said funds in trust to be paid to party of first part or its assigns as directed by the Board of Directors of the party of the first part, it being understood herein that it is the desire of the party of the first part to create a fund to redeem said mining land as herein described, and said trustee shall hold the said funds for that purpose unless the Board of Directors of the party of the first part shall determine not to exercise their option as provided in said redemption agreement hereinbefore referred to, and in that event the funds shall be disposed of as authorized by the Board of Directors of the party of the first part.

"4. Upon the failure of the party of the second part to meet any of the conditions hereof, the said trustee herein shall give 10 days notice in writing to party of the second part in which to make compliance with the terms of this contract, and upon failure of party of the second part so to do within said period of 10 days, the party of the first part may at its election repossess all of the shares of stock, other than said 50,000 shares represented by the down-payment provided herein which shall in that event be delivered by the trustee to the party of the second part or its assigns at the end of one year from

date hereof, and in that event, the party of the second part hereby elects, appoints and designates the said trustee its agent with full authority to sign and endorse said stock and transfer the same, and to execute all other documents that may be necessary for this purpose, and said trustee in that event is to deliver the stock duly endorsed to the party of the first part. In this event, the said trustee shall return to the party of the second part all payments made hereon, less any and all attorney and legal fees, incidental costs, and trustee's fees, not exceeding 2% of said payments.

"The party of the second part may, in the event of a default and within said 10 days after notice has been given as hereinabove provided, elect to have issued to it such number of shares of said Treasury stock as the amount of payments made by said party of the second part would entitle them, with the said shares to be priced at ten cents per share. In the event that it shall so elect, the original certificate hereinabove mentioned and provided shall be surrendered to the party of the first part by the trustee, and a new certificate in the amount of shares hereinabove mentioned shall be issued to the party of the second part.

"5. It is further understood and agreed that the trustee herein shall not be held personally liable for any actions, costs, or other expenses brought about by reason of the execution or performance of the terms of this contract. In the event of any such expense, trustee shall have recourse to the securities and funds herein provided for reasonable accounting, legal, and other incidental expense, not to exceed 2% of any cash funds so handled and accounted for. In no event shall the trustee distribute any of the shares herein to the purchasers or other persons within one year from the date hereof.

"6. In the event of the death, refusal, or inability to act on the part of the trustee herein provided, it is further understood and agreed that the party ·of the first part shall name and appoint the successor or successor trustees.

"(Signatures)"

On January 22, 1946, J. C. Johnson, trustee, voted the 200,000 shares for which certificates were issued dated January 21, 1946. With these shares, as indicated above, the Johnson group retained a majority; without these shares they would have failed of election. No one contends that the Johnson group would have had a majority without the 200,000 shares. There is no by-law nor provision in the Articles of Incorporation of the New Quincy Mining Company closing the books for any length of time prior to elec-

tions. As to element of time see: *Elliott* v. *Baker*, 194 Mass. 518, 80 N. E. 450.

At this election meeting Mr. Glenny (a member of the Floor group) and Mr. Erikson (an accountant and auditor frequently employed by the New Quincy Mining Company, and who officed with that Company and with Mr. M. B. Johnson) were appointed as a committee to check proxies and tally the votes. All of the proxies were turned over to this committee and the tellers then retired to an adjoining room to count the proxies and votes present. Mr. Erikson read off the proxies and Mr. Glenny checked the stock ledger as the names and number of shares were read. The name J. C. Johnson, trustee, 200,000 shares was read off and a similar record could not be found in the stock ledger. This proxy was set aside, and at the end of the checking Mr. Erikson reached into a drawer of the desk where he was working and withdrew therefrom a single stock ledger page bearing the entry, indicating that J. C. Johnson, trustee held 200,000 shares. The entry disclosed that it was made the preceding day, January 21, 1946. The explanation for this procedure as given by Erikson at the trial of this cause was that he had done the posting the preceding day and had failed to insert this page in the stock ledger book. The page has now been inserted in the Stock Ledger Book at its proper alphabetical place. Two other new pages following this one alphabetically were made up and inserted apparently prior to the January 22, 1946, meeting, having also been posted by Erikson on January 21, 1946. Glenny testified that J. C. Johnson came into the room while he and Erikson were checking and handed Erikson a paper and said to him: "You are not to use this unless you have to." Both Erikson and J. C. Johnson deny such a conversation.

Thereafter, the teller announced the results of the checking, as indicated above, favoring the Johnson group. The voting of the 200,000 shares was protested but the protest was overruled. The meeting was then adjourned. The Floor group sought information relative to the sale of the 200,000

shares but were unsuccessful, and were merely referred to the books of the corporation. They contend that an examination of the books (minute book and stock ledger) revealed nothing relating to the stock except as indicated. The minute book revealed no entry later than February 23, 1945—the minutes of later meetings were transcribed some time after this trouble.

The plaintiff then commenced this suit and upon discovery that the stock was held in trust for the Empire Canyon Mining Company and for H. H. Hintze, amended this complaint as indicated above.

The plaintiff's theory of the case is that Tuttle and M. B. Johnson, as President and Secretary, respectively, of the New Quincy Mining Company, fraudulently and unlawfully issued and delivered to the defendant J. C. Johnson, as trustee, four certificates representing 200,000 shares of treasury stock of the New Quincy Mining Company, and that this was done pursuant to an agreement theretofore made that J. C. Johnson would vote the same in favor of the Johnson group at the annual stockholders' meeting, to be held the following day, to perpetuate the Johnson group in office. Plaintiff alleges that no consideration for the stock was received by the company and that therefore J. C. Johnson was trustee for the company and that the stock therefore was not entitled to vote, and that the issuance of the stock was not authorized by the Board of Directors.

Defendants in answer allege payment of a consideration of $5,000 cash, $5,000 property and further installments in the sum of $10,000 to be paid, for the stock, and that the trust arrangement made was in the best interests of the corporation.

Upon trial of the issues, plaintiff was successful and the defendants have appealed. The defendants (appellants) have assigned as error each and every finding of fact (except formal matters) ; each and every conclusion of law; the overruling of demurrers both general and special; the denial

of motion to strike certain parts of the prayer; the denial of the motion to strike the reply; the denial of the motion to dismiss; the denial of the motion for new trial; and finally —"In the interests of brevity * * *" as they say—

"all rulings admitting evidence made by the court where objection thereto was made by the appellants, or any of them, or rulings over-ruling or denying evidence or testimony proferred by or on behalf of appellants or any of them. * * *"

Counsel at least seem to be hopeful, if not certain, of error.

Other facts of importance to this case will appear as the opinion proceeds. The 200,000 shares of stock so issued were shares that came back to the company over a period of years as a result of unpaid special assessments. Section 18-4-19 U. C. A. 1943, provides that such stock shall be treated as unissued stock. See also Art. IV of Art. of Incorp. as amended.

We will consider the assignments of error in much the same order as they are argued in the briefs, and limit our consideration to those so argued, since those assignments not argued in the printed briefs are deemed waived. *Duncan* v. *Hemmelwright,* 112 Utah 262, 186 P. 2d 965; *Parry* v. *Harris,* 93 Utah 137, 72 P. 2d 1044.

As we have previously indicated, the respondent's (plain-tiff's) original complaint asked only for relief by way of cancellation of the 200,000 shares of New Quincy Stock, and for injunctive relief against use or transfer of the shares during the interim. By amendment the respondent asked for additional relief, that is, ouster of the Johnson group of directors as elected, and declaration that the Floor group had been elected.

It is argued by appellants (defendants) that there has been inserted an action to try title to a corporate office for which quo warranto in the name of the state would have been the proper remedy.

That quo warranto is the proper remedy to try title to an office no one disputes. However, the primary relief sought here appears to us to be cancellation of the 200,000 shares of stock issued to J. C. Johnson, trustee, and to enjoin its transfer except back to the corporation for cancellation. If this relief is granted, there must be a finding that the stock was fraudulently issued, with the intention of retaining control of the company for personal gain and against the interests of the other stockholders. If this is found, then it would follow that the court might properly state what it in fact has indirectly determined, that, as a matter of law the Johnson Board of Directors were elected by virtue of stock fraudulently issued, and thus they were not properly elected at all. The case of *Schwab* v. *Frisco Mining & Milling Co.*, 21 Utah 258, 60 P. 940, 942, states the rule as follows:

"A court of equity would not assume jurisdiction to remove an officer of a corporation from his office of which he is in possession, or declare a forfeiture of his office; yet when the court has jurisdiction for one purpose, and the right and authority of certain persons, as officers, collaterally appear, it will inquire into and determine such questions." *Moses* v. *Tompkins*, 84. Ala. 613, 4 So. 763; *Nathan* v. *Tompkins*, 82 Ala. 437, 2 So. 747.

It would be a peculiar kind of justice if the equity court were only able to say the stock was fraudulently issued and order its cancellation, and then be unable to give the complete relief which would naturally follow, of declaring the legality or illegality of action pursuant to the fradulant issue. *Schwab* v. *Frisco Mining and Milling Co.*, supra, and cases cited therein. The ouster of the Johnson group and declaration that the Floor group members were elected is not the paramount relief sought. It is only incidental to a cancellation of stock fraudulently issued, and outstanding. *Consolidated Wagon & Machine Co.* v. *Kay, et al.*, 81 Utah 595, 21 P. 2d 836; *Trenchard* v. *Reay*, 70 Utah 19, 257 P. 1046; *Kinsman* v. *Utah Gas & Coke Co.*, 53 Utah 10, 177 P. 418. There was no error in

overruling the demurrers and objections made to inclusion of the additional matters in the prayer for relief.

Since the proceeding is one in equity by the plaintiff as a stockholder on behalf of himself and others similarly situated, and on behalf of the corporation, it does not appear that there need be joined as parties plaintiff the other members of the Floor group. He is not suing merely as a director to obtain an office for himself and for them. The allegation in the pleading is that the corporation and all of the books and records thereof are under the control and domination of the defendants Tuttle and M. B. Johnson. Any demand made upon said corporation to bring this action would be futile. *Goodliffe et al.* v. *Colonial Corporation, et al.*, 107 Utah 488, 155 P. 2d 177; *Continental Securities Co.* v. *Belmont*, 206 N. Y. 7, 99 N. E. 138, 51 L. R. A., N. S. 112, Ann. Cas. 1914A, 777. There was no error in overruling the demurrers on the ground of non-joinder of necessary parties.

The findings of the lower court that there was no consideration for the sale of the 200,000 shares of stock are attacked as error. The appellants argue from the evidence which was adduced as to the value of the machinery, and the fact that $5,000 was paid by Hintze that valuable consideration was in fact given for the shares.

Article XIII of the Articles of Incorporation of the New Quincy Mining Company as originally adopted and as amended provides that in determining whether or not a majority of the capital stock is present to legally hold a meeting the capital stock "duly paid for and issued" shall be the shares considered. This expression contemplates fully paid up stock. The agreements of sale in this case should be measured in the light of this requirement, not only as they may or may not evidence voting power in the holder (trustee) of such stock, but as this requirement may help in determining the character of the transaction as to whether or not they were mere sham. It must be conceded that the voting power of the stock is commensurate with its

power to be classed as "duly paid for and issued." If not "duly paid for" it cannot be used either as voting stock or as "issued" stock to be counted toward a majority of the stock represented at any meeting. What then is the nature of these agreements to buy capital stock?

Paragraph 4 of the agreements is the important paragraph. First, may it be said that there are two ways in which the purchaser may mature his right to the shares of stock he (or it) contemplates purchasing under the terms of the agreement: (1) by full compliance with the terms of the contract, and (2) by default and exercise of the options given by paragraph 4. As to the first way, so far as it pertains to the purchase of the Empire Canyon Mining Company, it is very indefinite as to when full compliance with the contract would or could be accomplished. As to the second: Paragraph 4, at first gives the impression that at least 50,000 shares of stock were sold; but the option paragraph indicates that in case of default and upon notice, the purchaser may indicate how many shares, commensurate with payments made, he desires to take. This provision coupled with the provision of the "Now Therefore" paragraph of the contract to the effect that the parties agree "to purchase" and "to sell" (indices of future action) obviously indicate that until default and some indication, after notice of default, of the purchaser's intentions, no passing of title was intended. Thus, on January 22, 1946, the issuance of the stock to the trustee amounted to nothing so far as the company was concerned. The whole transaction could have been carried on without a trustee, with the stock remaining with the company.

This raises the question of the purpose of creating the alleged trust and transferring the stock to the trustee.

M. B. Johnson testified that the trustee was to hold the money for the stock to be sure it would be available for a certain contemplated use of the corporation—to buy back a certain 38 acres of land standing in the name of another

mining company. (We discuss this later.) Assuming this to be the truth, it is probative merely of a desire of the directors (the Johnson group) that these funds be segregated from the general funds of the corporation that they might not be expended for other purposes—purely a corporate administrative matter that has no value as evidencing an outright sale to the trustee, and thereby placing that stock in the category of "duly paid for." To pass funds from one company pocket to another does not evidence a sale. If that was the reason for the trust, then the trustee was merely acting on behalf of the corporation and an issue of stock to him accomplished nothing.

The stock purchase agreement provides that the trustee shall vote the stock. Such a provision can have no effect unless the stock is considered "duly paid for and issued" stock, but it does have probative value as indicative of a purpose for the trust—a scheme to retain control of the company. This is especially true when it is considered that the trustee is a stockholder and a brother of M. B. Johnson, the leader of the Johnson group, and also that in case of his death (see ar. 6 of agreement) the defendant company shall have power to select a new trustee. These facts do not stand alone, however. Let us consider some of the others.

The New Quincy Mining Company as now constituted owns 103 acres of mining property in claims located contiguously. In addition to this, the company holds an option to purchase for the sum of $13,000 a 38 acre tract adjoining such claims which tract is presently owned by the Park Utah Consolidated Mines Company. The option was exercisable on or before November 4, 1944, but was renewed each year under a provision of the option providing for extensions from year to year; to and including 1947, by payment of the sum of $500 for the renewal each year. The 38 acre tract, the property of Park Utah Consolidated Mines Company had previously been owned by the New Quincy Mining Company and was acquired by Park Utah as a result of settlement of certain financial difficulties of the New Quincy

Mining Company some years earlier. The details of the transaction are not important to this case. Entry to the New Quincy property is gained by means of the Daly West Tunnel through property owned by Park Utah. Access to the 38 acres is also gained in this way.

All the New Quincy Mining Company property is presently under lease to the Empire Canyon Mining Company (one of the purchasers of the 200,000 shares), including the 38 acres, upon which the option agreement with Park Utah permits New Quincy Mining Company to conduct mining operations. This lease was to one Coulam, a stockholder and director of the defendant company with a provision for assignment and was assigned to the Empire Canyon Mining Company as a part of the foundation for its organization.

The Empire Canyon Mining Company was incorporated in 1943 with its entire capital stock being paid for by the assignment of that lease and $1,000 cash. The evidence indicated that the $1,000 cash was put into the Empire Canyon Mining Company by P. C. Reynolds, one of the incorporators, who received the money in the form of a check from the New Quincy Mining Company, the check having been issued by M. B. Johnson. It does not appear that the payment was ever ratified by the Board of Directors of the New Quincy Mining Company. No mention of such a transaction is made in any of the minutes of the New Quincy Mining Company. Mr. Johnson contends it was a debt due Mr. Reynolds, yet, he insisted that the latter turn it in to the Empire Canyon Mining Company.

The only mining activity which has occurred on New Quincy ground under the lease has been that work necessary to afford the lessee access to property which was leased by the Empire Canyon Mining Company from Park Utah Consolidated Mines Company, and therefore, no royalties have ever been paid under the lease as rent and as provided by its terms; but the lease has not been cancelled.

As appears from paragraph 1 of the Empire Canyon Mining Company agreement to purchase, the purchaser's down payment for stock is a bill of sale of certain mining equipment used on the premises leased by them from the the defendant company. A valuation of $5,000 is fixed for this equipment. There appears to be no provision for the continued use of that equipment by the lessee. This is important in view of the fact that said Empire Canyon Mining Company is contemplating paying the balance of the stock purchase price from funds acquired by the operation of the mining property. This evidence, with the evidence of what has previously happened in the operation of that property, raises a grave question of whether or not the purchase of stock will ever be accomplished. Furthermore, the testimony in the case throws considerable doubt as to the ownership of the equipment. There is testimony that part of it was really the property of the defendant company.

Under the Hintze purchase agreement, the initial payment is $5,000 cash down and $2,000 on or before October 1, 1947, and $3,000 on or before October 1, 1948. (Incidentally, both agreements are dated January 10, 1946, though they were not approved until later that month.) There is quite a conflict in the evidence as to where and when $4,000 of this initial $5,000 was paid. One thousand dollars of the $5,000 was paid by check dated January 10, 1946; the other $4,000 was claimed to have been paid in cash in an envelope. As in the Empire Canyon Mining Company purchase agreement, upon default the trustee is to give 10 days' notice of the necessity of compliance, and thereafter the purchaser may exercise his option as to the number of shares he will take.

It seems obvious from both agreements that default in payment cannot arise for quite some time. On the Hintze agreement from January, 1946, to October, 1947—maybe longer and until October, 1948; and on the Empire Canyon Mining Company contract from January, 1946, to some indefinite date shown to have been a date on which the lessee-

purchaser has acquired funds from mining operation on New Quincy property which it refuses to apply upon the purchase price. The initial payments on these two stock purchase contracts were $10,000—one payment of $5,000 being in the form of property of doubtful salable value. The option price of the 38 acres from the Park Utah Consolidated Mines Company was $13,000. As this latter purchase is claimed as the foundation for the alleged sale of the 200,000 shares, it seems obvious that that transaction would take quite some time to consummate by application of the proceeds from the stock purchase agreements. Yet, during all this time the Johnson group would have control of the voting power of the 200,000 shares. In the meantime, the Park Utah option may run out, or the directors under par. 3 of the stock purchase agreement may decide not to exercise it.

Without reference to further details of the facts it seems obvious from what we have set out that the entire set of circumstances were such that they clearly preponderate in favor of the holding of the lower court that the issue of those 200,000 shares to the trustee was merely an effort on the part of the Johnson group to hold control of the majority of the shares of the defendant company. Whether or not Hintze actually took an active part in the fraud—it is hard to see how he would be unaware of the situation, as he was President of the Empire Canyon Company and participated in the agreements—makes little difference as, obviously, his willingness to buy shares has been used by the directors as a foundation for trying to place the trustee in the position of a purchaser, and to retain control of the voting power of that stock. Hintze did not acquire title to any stock. So far as the prospective purchasers were concerned, the trust was a useless gesture, and indicated on its face motives other than those expressed.

Appellants take exception to the introduction of evidence concerning the lease to the Empire Canyon Mining Company. They say it has no bearing upon the question of the validity of the transaction. We can see no merit to this

contention. The agreement of that company to purchase stock in the New Quincy Mining Company (Par. 1) specifically refers to the lease as a foundation for determination of the balance of the purchase price of the stock. Reference is there made to the smelter returns from ore shipped under and by virtue of the lease. The bona fide character of the agreement to purchase New Quincy stock certainly encompasses the price to be paid for it; and if there is a lack of evidence of what the amount of the installments will approximate over any given period, it seems to us a very material fact. From the evidence before us the installment end of that contract is a complete blank as to time and payments. A formula is given for application without any history of possibilities or accomplishment to base it upon.

With reference to appellant's objection to the lower court's failure to strike from the prayer of the complaint the matter pertaining to the election of directors, we refer to the previous statements in this opinion as to the primary purpose of these proceedings—that of setting aside the issue of the 200,000 shares of stock.

Appellants have attacked the findings of fact, conclusions of law, and decree of the lower court. Although some of those findings we believe were immaterial — particularly those pertaining to the validity of the organization of the Empire Canyon Mining Company and the validity of the lease to that company—the evidence in this case clearly preponderates in favor of the lower court's findings and conclusions to the effect that the sales agreements were fraudulently entered into for the purpose of maintaining control of the company; that title to the stock did not pass to either the trustee or the alleged purchasers; and that the company received no consideration for the stock. To that extent the lower court's findings of fact are sustained. It follows as a matter of course that the Johnson group are not properly elected officers of the company.

The decree of the lower court is affirmed.

WADE, J., concurs.

McDONOUGH, C. J., and LATIMER, J., concur in the result.

WOLFE, Justice (concurring).

I concur for the reasons herein stated.

I agree with the view of the prevailing opinion that the contracts by which New Quincy Mining Co., hereinafter referred to as New Quincy, purported to sell 100,000 shares of its treasury stock to each of Hintze, and the Empire Canyon Mining Co., hereinafter referred to as ■ Empire, were part of a fraudulent scheme on the part of the Johnson group to retain control of New Quincy, by securing to themselves the voting power of an additional 200,000 shares of stock. This conclusion is based mainly upon the following factors, all of which are pointed out in the prevailing opinion:

(1)  The transaction was proposed to the New Quincy board of directors only 10 days before the annual stockholders' meeting for the election of officers was scheduled to take place, and the agreements were not consummated until three days before that meeting.

(2)  The trustee, who was Johnson's brother and was a stockholder and member of the Johnson group, was to retain the control and the voting power of the full 200,000 shares of stock, although 100,000 shares (50,000 shares to each of the two purchasers) was purportedly fully paid for. There is no apparent legitimate reason why the trustee should retain the control and voting power of that stock which was fully paid for nor why he should not be a neutral party free from partisanship. Yet the contract expressly provided that the trustee should make no distribution of the stock within one year, and from the other provisions of the contract it is apparent that he would retain control for a

considerably longer time than one year, as is pointed out in the prevailing opinion.

(3) In case the trustee appointed by the terms of the stock purchase agreements for any reason failed or refused to serve, the purchasers were to have no voice in the appointment of the successor trustee, that right being reserved exclusively to New Quincy.

(4) At the time of the stockholders' meeting, when the votes were being counted, the stock-ledger record of the sale of the 200,000 shares was not in the stock-ledger, but was on a separate page in one of the desk drawers. Furthermore, this page was not produced by Mr. Erikson, the representative of the Johnson group, until after the checking was completed, and it was apparent that without the 200,000 shares, the Johnson group would lose the election. Moreover, there is the testimony of Mr. Glenny, the representative of the Floor group in the tallying of the votes, that during the course of the counting, J. C. Johnson came in the room and handed to Erikson a paper, and at the same time gave him oral instructions that he was not to use it unless he had to.

These factors, together with the other facts pointed out in the prevailing opinion, are, I believe, when considered together, sufficient to sustain the trial court's findings and conclusions as to the fraudulent nature of the contracts. And since the contracts were fraudulent, the trial court properly ordered canceled and set aside the 200,000 shares of stock thus issued. This I think is determinative of the case.

It is stated in the prevailing opinion that:

"The ouster of the Johnson group and declaration that the Floor group members were elected is not the paramount relief sought. It is only incidental to a cancellation of stock fraudulently issued, and outstanding."

As to this conclusion, I have grave doubts. It appears to me that the ultimate purpose of this suit by the Floor group

was to gain control of the company. However, in order for them to accomplish this result it was necessary to have set aside the sale of the 200,000 shares of stock, and this could be accomplished only through equity proceedings. And equity, having properly obtained jurisdiction, will retain jurisdiction to administer complete relief, although the incidental relief might ordinarily be granted in a court of law. I agree, therefore, that there was no error in the ruling of the court below on the objections raised by defendants to the supplemental relief prayed for by plaintiff in his complaint.

The prevailing opinion reaches the conclusion that under Article XIII of the Articles of Incorporation of New Quincy, only stock "duly paid for and issued" was votable, and further concludes that under the terms of the contracts for sale of the 200,000 shares of stock, none of the 200,000 shares were duly paid for or issued. In reaching this conclusion, Mr. Justice PRATT construes the option agreement contained in paragraph 4 of the contract between New Quincy and Empire (set forth in the prevailing opinion) as being applicable to the entire 100,000 shares of stock sold, although a block of 50,000 shares was purportedly fully paid for. The same reasoning would also be applicable to the Hintze contract. I freely admit that the terms of these contracts are very ambiguous, but my interpretation would be that the option agreements in the contracts did not apply to the 50,000 shares purportedly fully paid for by the down payments, but only to the other 50,000 shares, or portion thereof that might have been paid for. The option itself is of a peculiar nature permitting the purchasers, after default, not to buy, but to take stock up to the amount paid for at 10c a share. However, that is a question about which we need not seriously concern ourselves here. Having found that the contracts were fraudulent and that they must be set aside and the stock issued pursuant thereto cancelled, I see no reason for considering what the proper interpreta-

tion of such contracts would be if they were valid. I merely note here my exception to that portion of the prevailing opinion which attempts to interpret and construe the option clause of the contracts.