SAMUEL McINTYRE, APPELLANT, *v.* THE AJAX MINING CO. ET AL., RESPONDENTS.

1. *Corporations—Transfer of Stock—Contract for—Consideration of—Dismissal of Suit—Error.*

> M., a stockholder of the Ajax Mining Company, brought suit in behalf of himself and stockholders, to compel restitution into its treasury of certain stock; claiming that R. and K. entered into an agreement with S. and S. for the purchase of the disputed stock, and that the contract on the part of R. and K. was performed by payment to S. and S. with money and

property of the company. At the trial there was evidence introduced by the plaintiff tending to show that the payment of a claim of S. and S. and the transfer of the stock were one and the same transaction, and provided for by the contract. The defendant R. and his codefendants introduced evidence tending to show that the payment of the claim and the transfer of the stock were separate transactions, and that R. had paid a certain sum to S. and S. Under the arrangement, property and money of the company were used in payment, and R. received a transfer of the stock in his own name, and the claim was liquidated. The contract, which was missing at the trial, was traced into the hands of R. M. demanded of him and his codefendants a production of the contract, for examination and introduction in evidence. The court ordered R. to produce it, and adjourned court to give him time to do so. R. afterwards found a copy thereof, and stated to one of his attorneys that he could not swear that it was a true and correct copy, and was thereupon advised by the attorney that unless it was a true and correct copy it could not be used in evidence. R. then suppressed it, and, after departing from the state, had an affidavit placed on file respecting the same, in which he admitted the finding of the copy. No further evidence concerning the missing contract, or its terms and conditions, was introduced, and judgment of dismissal of the action was entered. *Held*, that M. was entitled to be permitted to inspect the contract, and to introduce it in evidence, if it could be produced, that R. had given no sufficient reason for failing to produce it, or the copy which he had found and submitted to his attorney; that the instrument which R. found should have been submitted to the court to determine its admissibility; that R. by his acts created a suspicion, if not a presumption, that the terms and conditions of the instrument were favorable to his adversaries; and that under the circumstances the action of the court in dismissing the case must be reversed, and a new trial granted.

2. *Corporation—Stockholders—Directors—Fiduciary Relations of.*
   In a controversy over the affairs of a corporation, between the directors and stockholders, the acts of the directors, because of the fiduciary relations existing between the officers and stockholders, will be closely scrutinized in equity, and the directors

held to a strict degree of care, duty, fidelity, and disability; and they will not be permitted to gain a pecuniary advantage over the stockholders because of, their official positions, and consequent superior knowledge of the affairs of the company.

(No. 945.   Decided Aug. 15, 1898.)

Appeal 'from district court, Salt Lake county; Ogden Hiles, *Judge.*

Action by Samuel McIntyre against the Ajax Mining Company and others.   From a judgment dismissing the action, plaintiff appeals. . *Reversed.*

*Brown & Henderson, Moyle, Zane & Costigan* and *P. J. Daly,* for appellant.

*King, Burton & King, Powers, Straup & Lippman,* and *Dey & Street,* for respondents.

BARTCH, J.:

The plaintiff is a stockholder of the Ajax Mining Company, and brought this action against the company and its board of directors, in behalf of himself and the other stockholders, to reclaim, and compel restitution into its treasury, of 44,800 shares of the capital stock of the company.   At the trial the court entered a decree in favor of the defendants, dismissing the action.   Thereupon the plaintiff appealed.

It is alleged in the complaint, substantially, that the company was organized under the laws of Utah about October 22, 1894; that the plaintiff owned 115,000 shares of its capital stock; that defendants Knox, Ryan, Lowe, King, Nebekor, Boyle, and Robinson, at the time of bringing this suit and for nine months previous thereto, constituted the board of directors; that, upon demand made,

the board failed to institute suit to protect the interests
of the stockholders; that on and prior to April 1, 1896,
Henry Shields and Wilson I. Snyder, of Park City, Utah,
owned jointly 44,000 shares of the stock of the corpora-
tion, and also had a claim against the company of nearly
$25,000, which was due; that at some time (the exact date·
not being known to the plaintiff) the defendant corpora-
tion entered into a contract through its agents, with
Shields and Snyder, by which their right and title to the
44,000 shares were relinquished, and their claim settled
and paid by conveying to them the Cobb tunnel and eight
acres of dump ground, property of the company, valued
in the trade at $12,000, and agreeing to pay them in addi-
tion thereto, for the claim and stock, $8,000 in cash; that
when the contract was made the defendants Robinson
and Boyle were not directors, but the plaintiff and one
Isaac Jennings were (the plaintiff, however, not having
been present at the meeting of the board when the con-
tract was consummated and ratified); that he protested
against it; that, at the time of transferring the stock, de-
fendants Ryan and Knox, for the purpose of concealing
the true nature of the transaction, personally paid a small
amount of money, or obligations to a small amount, not
exceeding $6,000, when the stock was worth $20,000; that
$20,000 was paid by the company; that the stock, when
delivered, was not placed into the treasury of the com-
pany, but was taken by Ryan and Knox, and, by conspir-
acy and fraud between them, was made over to Ryan, who
has since used it as his own, and hypothecated a part of
it to defendant McCornick; that the plaintiff has de-
manded of the board to bring suit therefor to have the
same placed into the treasury, but the board has refused
to do so, and has been acting in collusion with Ryan and
Knox; and that Ryan and McCornick have been threat-

ening to vote the stock at the annual meeting of the company for the election of directors. It is not denied in the answer that the stock was transferred from Snyder and Shields to Ryan under a contract, but it is denied that the Cobb tunnel and dump ground were transferred in payment of the stock, and it is averred that the plaintiff assented to the entire transaction, that it was advantageous to the company, and that the purchase of the stock and settlement of the claim were separate and independent transactions, and not related to each other. Under the pleadings, it will be noticed that the material point in controversy is whether or not the purchase of the stock and settlement of the claim was one and the same transaction. The appellant maintains the affirmative of this proposition; and the respondents the negative. The evidence shows that the amount of stock involved in this controversy is 44,800 shares, and that the amount of the Snyder and Shields claim against the company was $19,634. The appellant contends that it is shown by the evidence that respondent Ryan, before he became a director of the respondent company, acting for himself and Knox, made an arrangement with Snyder and Shields whereby Ryan and Knox were to pay a certain sum by liquidating certain debts due from Snyder and Shields to other parties, and for which debts the stock was pledged, and whereby Ryan and Knox were to secure or procure to be secured by the respondent company, the claim of $19,634, and that, after Ryan became a director of the corporation, he and Knox entered into a contract in writing with the same parties, and agreed that their claim should be paid, instead of secured by a lien on the property of the company. In this written contract, the appellant insists, no mention was made of the stock, but that nevertheless the contract related to the stock as well as

the claim, that the stock and claim were parts of the same transaction, and that the contract was guaranteed by one Nelligan. The respondents admit that Ryan entered into a written contract with Snyder and Shields, but insist that it was for the purchase of the stock by himself alone, and had nothing to do with the payment of the claim of $19,634, and that the purchase of the stock and payment of the claim were separate and distinct transactions. The evidence shows that the stock was afterwards transferred to Ryan, and that the claim was paid by the board of directors with money and property of the company. The court found that Ryan bought the stock for himself alone, agreeing to pay therefor $6,000, and that early in November, 1895, the consideration was fully paid. This finding, with others, is assailed on the ground of insufficiency of the evidence to sustain it. In the view we take of the case on the appeal, it will not be necessary to express an opinion on any point presented, except that relating to the contract in question.

Referring to that contract, and the terms thereof, the witness Daly, who said he had seen the contract and made a memorandum of it, testified as follows: "The contract was made between Henry M. Ryan and Wilson I. Snyder and Henry Shields. The substance of the contract was that Ryan agreed to purchase the claim of Snyder and Shields against the Ajax Company, and pay therefor the sum of $20,000, by giving a mortgage on the property of the Ajax Company for that amount, including the claims of Burke and Salisbury, and the claim due Knox and Ryan, with a proviso that, if Ryan could get the other claimants to throw off $4,000, Snyder and Shields also offered to throw off $4,000; leaving $20,000 secured by a mortgage in favor of Snyder and Shields. The contract was guaranteed by John Nelligan in words as follows:

'I hereby guarantee the performance of this contract on the part of H. M. Ryan. [Signed] John Nelligan.' I am positive that there was no stock mentioned in the contract, and my best recollection is that it was dated in January, 1896, but I would not swear positively as to the date." The witness Snyder (one of the contracting parties), as appears from the abstract, testified: "We held 44,800 shares until November, 1895. We sold it to Ryan. Q. Was the contract in writing, by which you sold it? A. Yes, sir. Q. Do you know what became of the contract? A. It was in duplicate. I kept one copy and Mr. Ryan kept the other. My recollection is that I afterwards mailed my copy to him. Q. This contract—was it indorsed by anybody? A. Guaranteed by Mr. Nelligan. Q. Now can you state, in any way, the terms of that contract? A. I could, in a general way. I could not give any specific details of it. Q. Well, let me ask you if, by the terms of that contract— In the first place, how much money did you receive on that contract? A. Six thousand dollars; that is, substantially that. Q. You received that? Now, what else was the consideration for that contract? A. Why, we had a claim against the Ajax Mining Company, that had been settled and allowed; and we were to have that secured further in some way, or provided for, so that we could get our money. Q. By whom? A. Well, it was part of the contract. Q. How was that? A. That was part of the contract. Q. Part of the contract was that who should secure it? A. Why, Mr. Ryan. Q. That Mr. Ryan should secure it? A. Should get it secured or procure it to be secured. Q. Procure it to be secured by the company? A. Yes, sir." The witness further testified that he thought their claim was $19,634; that it was settled about the last of March or first of April, 1896, by the payment to them of some money, and

a conveyance to them "by the Ajax Mining Company" of a right of way through the Cobb tunnel, and some surface ground at the mouth of the tunnel. The witness on cross-examination also said: "I may have asserted such an opinion at the meeting in Mr. Daly's office in November—that the Cobb tunnel transaction and the purchase of the stock was all one transaction." The witness Sutherland testified: "I remember meeting Snyder and Shields, Daly and McIntyre, in Daly's office. It was stated in substance by either Snyder or Shields, in the presence and hearing of each other, and assented to, that in case the transaction which was then being negotiated was closed up by McIntyre, and assented to, that they would furnish the proof and establish the fact, if he brought a suit in relation to this stock, that the 44,000 shares of stock, or the stock in controversy, was purchased and paid for by the property of the company, and that the transaction by which the stock was purchased, and the tunnel site and dump and other considerations paid by the company, was all one transaction—that the arrangement was between Ryan and Knox, on the one side, and they (Snyder and Shields) on the other." The testimony of the witnesses McIntyre and Daly respecting the statements of Snyder or Shields is to the same effect as that of the witness Sutherland. By direction of Ryan, it appears, this stock was transferred in November, 1895, from Snyder and Shields to one Hickman, and from him to Ryan. Hickman, testifying as a witness, said: "I delivered it to Ryan. After that time, in the following spring, I had a talk with him about the payment for that stock. He said he had made a payment to Snyder by paying him some money—the amount I can't say—and a certain tunnel on or about the Ajax property in Tintic. This was some time in the spring after this deal in the fall."

It will be perceived from this, and other evidence in the record, that it is not clear as to what the terms of the contract in dispute are; and yet what its terms and conditions in fact are is a matter of paramount importance in this case, for, if it should turn out that the securing and payment of the claim was a consideration for the transfer of the stock, then, clearly, the corporation, having paid the claim with its own money and property, would have an equity in the stock—at least, to the extent of the consideration paid by it. The contract, which would furnish evidence of its terms and conditions, was not introduced. It was traced into the hands of Ryan, but upon frequent demands therefor by the counsel for the appellant, and upon several adjournments of the court to give time for its production, the respondents failed to produce it. Nor did the defendant Ryan offer himself as a witness to testify to its contents, even after having promised in open court to produce it, or a copy thereof, and failed to do so. Finally affidavits from respondents Ryan and Boyle, respecting the failure to produce the contract were submitted to the court. The one from Ryan, who, it appears upon adjournment of court went to Chicago, and there made affidavit, reads as follows:

"STATE OF ILLINOIS, ⎱ ss.
     County of Cook.      ⎰

Henry M. Ryan, being first duly sworn, deposes and says that he is one of the defendants in the above entitled action; that affiant did state in court, during the hearing of this cause, that a copy of the original contract had disappeared from his table in his apartments in the Knutsford Hotel, Salt Lake City, but that, to the best of his belief, he had a copy in the safe of said hotel, and that he would make search for said copy, and produce it that afternoon in court; that he did find the instrument

referred to, but that, upon reading the same, was unable to state that it was a true and correct copy of the original contract; that he showed the said instrument to his attorney, Judge Street, and informed his attorney that he could not say or swear that it was a literal copy of the original contract; that said affiant was then informed by his attorney, Judge Street, that the said copy, if not a true and correct copy of the original contract, could not be used in evidence; affiant then wrote to Judge Boyle, at Chicago, requesting the return of the original contract, but had received no reply to his letter at the time of leaving Salt Lake City for Chicago, and since arriving at Chicago had made request to Judge Lawrence P. Boyle for the contract, and is informed by said judge that, after careful and diligent search of his papers, he (said Judge Lawrence P. Boyle) has failed to find it. Hence affiant is therefore unable to produce the same in court.

H. M. RYAN."

The one from respondent Boyle reads:

"STATE OF ILLINOIS, ⎫ ss.
    County of Cook.    ⎭

"Lawrence P. Boyle, being first duly sworn, deposes and says that he is one of the defendants in the above-entitled action; that affiant has read the affidavit made this day by Henry M. Ryan in the above-entitled cause, and attached hereto; that he did receive certain papers from said Ryan, among which was, as affiant believes, a certain document which purported to be a contract between Wilson I. Snyder, of Park City, Utah, and the said Henry M. Ryan, which contract, affiant believes, related to the sale of certain shares of stock, to wit: about 44,000 shares of the Ajax Mining Company to said Henry M. Ryan; that said Ryan had recently requested affiant to let him have said contract; that affiant had duly searched

through the papers of said Ryan in his possession for said contract, but has been unable to find the same; that affiant has no copy of said contract; that said Henry M. Ryan, some, time after he had mailed said contract to affiant, informed affiant that he had mailed the same to him in order that he might, if requested by John Nelligan, exhibit the same to him as evidence that the same was canceled, and that he (Nelligan) was no longer in any manner liable as guarantor upon the same.

LAWRENCE P. BOYLE."

It seems no further evidence was introduced concerning the missing contract, or its terms and conditions, but judgment of dismissal of the action was entered. It was clearly the right of the appellant to be permitted to inspect the contract, and to introduce it in evidence, if it could be produced; and the respondent Ryan had no right to suppress it, or a copy thereof, as is indicated in his affidavit. Ryan said in his affidavit, as will be observed, "that he did find the instrument referred to, but that, upon reading the same, was unable to state that it was a true and correct copy of the original contract;" and the only excuse he gives for refusing to produce that instrument is that his attorney advised him that, if it were not a true and correct copy, it could not be used in evidence. Was it the prerogative of his attorney to pass upon the admissibility of that instrument? Can a client shield himself behind such advice, under the circumstances of this case? We think not. If such a practice were tolerated, the gates to fraud would soon be wide open. If such were the law, instruments of the greatest importance in any case could be suppressed, and their introduction in evidence prevented, at the mere will of the party having them in custody, and his attorney. In this case the court regarded the contract in question of sufficient importance

to adjourn the hearing in order that it might be produced, and the instrument which was found ought to have been submitted to the court, to determine its admissibility. By his acts the respondent Ryan has created a suspicion, if not a presumption, that the terms and conditions of the instrument were favorable to his adversaries; and therefore another opportunity must be afforded to produce the contract, or introduce further evidence of its contents, in case the instrument cannot be found. We are not satisfied that the contract cannot be produced. If it be produced, it may be decisive of the question whether or not the negotiations respecting the payment of the claim and the transfer of the stock were one and the same transaction. This is a controversy over the affairs of a corporation, in which the acts of the directors are involved, and the rights of the stockholders are to be determined. In such case the acts of directors, because of the fiduciary relations existing between the officers and stockholders, will be closely scrutinized in equity, and the directors held to a strict measure of care, duty, fidelity, and disability. Honest and faithful administration of corporate affairs, and fidelity of the trustee to the cestuis que trustent, are what the law aims at; and directors of a corporation will not be permitted to gain a pecuniary advantage over the stockholders because of their official positions, and consequent superior knowledge of the affairs of the company. "That a director of a joint stock corporation occupies one of those fiduciary relations where his dealings with the subject matter of his trust or agency, and with the beneficiary or party whose interest is confided to his care, is viewed with jealousy by the courts, and may be set aside on slight grounds, is a doctrine founded on the soundest morality, and which has received the clearest recognition in this court and in others." *Oil Co.* v. *Mar-*

*bury,* 91 U. S. 587; *Peabody* v. *Flint,* 6 Allen 52; *People* v. *Township Board of Overyssel,* 11 Mich. 222.

We are of the opinion that the respondent Ryan, during the trial of the cause, with reference to the contract in question, did not act with the fidelity which the law requires of a director, and are not convinced that complete justice was done, and therefore a new trial must be granted. Although we have examined the voluminous record with care, we intentionally, in the absence of that contract, refrain from expressing an opinion as to what result is indicated by the evidence. Nor do we deem it important to discuss any other question presented. The case is reversed, and the cause remanded, with directions to the court below to grant a new trial.

ZANE, C. J., and MINER, J., concur.