HANSEN et al. v. GRANITE HOLDING CO. et al.

No. 7339.  Decided May 11, 1950.  (218 P. 2d 274.)

Rehearing Denied January 2, 1950.

532

See 19 C. J. S., Corporations, sec. 761. Corporations, sales of property by, see note, 68 A. L. R. 12. See, also, 13 Am. Jur. 922.

*Rawlins, Wallace & Black,* Salt Lake City, *Shirley P. Jones,* Salt Lake City, for appellants.

*Jensen & Snow,* Salt Lake City, for respondents.

WADE, Justice.

This is an action by Ralph Cutler, Hettie May Bates and William S. Young, plaintiffs and respondents here, as stockholders of the Granite Holding Company, a corporation, on behalf of the corporation, to set aside as fraudulent and made in bad faith a purported sale and conveyance by the corporation of all of its assets to William L. Hansen, and for an account by him of the rents and profits received by him while in possession. The trial court entered judgment in favor of the corporation setting the conveyance aside and for $29,246.05, from which the defendants appeal claiming

(1) that there is no evidence to sustain the trial court's findings of fact; (2) that the findings do not justify the judgment; and (3) that in the accounting he was entitled to credits which the trial court denied.

The Granite Holding Company, known as the Granite Lumber Company prior to 1927, has for many years been principally owned and completely operated by Nephi J. Hansen. He is the father of William L. Hansen to whom the corporate assets were conveyed by deed dated July 16, 1945. William and Nephi and the corporation were named defendants. The judgment runs in favor of the corporation and against William. All three defendants join in the appeal.

Since 1919, Nephi has been the president, a director and the general manager of the corporation and has completely dominated its operation as if its property were his own. No stockholder's meetings have been held since 1927. During that time all the directors, except a few personal friends and business associates of Nephi, have been members of his immediate family. Director's meetings have been held only when he felt it legally necessary to have his actions ratified and the directors have followed his wishes without exercising any individual judgment thereon. Other than to sufficiently have his wishes approved in the director's meetings and privately to the members of his own family, he has made no reports to the stockholders of the conditions of the corporation's finances and although some of the outside stockholders inquired of him about its affairs both immediately before and after this conveyance, he made no mention that such sale had been made or was contemplated, but completely withheld from them all information in regard thereto and they finally learned thereof from other sources.

This action was commenced December 21, 1946, by Lewis F. and Clyde Hansen, both of whom are sons of Nephi and brothers of William, and both of them were directors of the

corporation and signed the minutes of the director's meeting authorizing the sale. Clyde was the secretary and drew those minutes up. They recite that the meeting was held July 18, 1945, two days after the date of the deed; that three new members of the board were, at the meeting, appointed and qualified; that the sale of all the remaining assets of the corporation was authorized for not less than $10,000.00, and that, $5,000.00 thereof be paid to Nephi in full for back salary previously authorized. No records were produced which showed that back salary was owing. All of the directors, including Lewis F. and Clyde and the newly appointed directors, signed these minutes and although at that time everyone knew that the purported sale to William had been completely arranged, no mention that he was to be the purchaser was made in the minutes.

Shortly after the complaint was filed, Clyde withdrew as a plaintiff and later an amended complaint was filed in which the names of W. V. Jensen, Mrs. J. E. Jensen, Ralph Cutler, Hettie May Bates and Robert H. Young were added as plaintiffs. The Jensens are a son and the widow of J. E. Jensen who was a director and signed the minutes which authorized the conveyance. He died before the action was commenced. Robert H. Young passed away in 1930 and his stock was owned by his son, William S. Young, when the action was instituted. During the trial the action was on their own motion dismissed as to Lewis L. Hansen and the Jensens, and William S. Young substituted for his father Robert H. Young, leaving only the three plaintiffs mentioned at the beginning of this opinion. Each of them were stockholders of the corporation and none of them nor their predecessors participated in or approved the purported sale or knew anything about the fact that it was contemplated or had occurred, until long after it was closed.

There was $74,000.00 worth of subscribed and outstanding preferred stock, which the articles required should pay 8 per cent annual dividends with the right to vote in case

the dividends were more than three years delinquent. Most of plaintiffs' stock was preferred and no dividends had been paid since the early 1920's. There was $350,000.00 worth of shares at par of common stock subscribed and outstanding.

The property which was conveyed consisted of a strip of ground covered by several two story buildings on the southwest corner of 21st South Street and Highland Drive. This is in the center of Sugar House business district in Salt Lake City. It is separate and some distance from the main business center of Salt Lake City. The buildings adjoin each other and cover the lot clear to the sidewalk with an 85 foot frontage on 21st South and 207.5 foot frontage on Highland Drive. The ground floor is rented for stores and business establishments and the upstairs rented as apartments. For many years the corporate business has been the management of this and other similar property which it previously owned in that neighborhood.

The corporation's real property has all been mortgaged for many years and during the depression it was in financial difficulties. The mortgage was as much as $200,000.00 in 1927; since that time various pieces of its real property has been sold, the proceeds applied as payment on the mortgage and then a renewal note and mortgage has been made for the balance against the remaining real property which it owned. On May 15, 1939, after several sales had been made, the board of directors authorized the sale of all or any part of the corporation's real property on the best terms obtainable and directed that the proceeds of such sales be paid on the mortgage. Under that authority it sold its remaining property, except that involved in this action, and after paying the proceeds on the mortgage on November 1, 1941, a renewal note and mortgage was executed against the remaining real property for $82,528.13 with 4 per cent interest payable in monthly installments of $275.00, plus an estimated prorata of the taxes and insurance premiums until January 1, 1943, and from then on an additional monthly payment of $500.00 principal was

required. The deed was delivered to William before July 28, 1945, and was recorded by him on that date. He took possession August 1st, at which time the interest, insurance and taxes were all paid up to date and $8,028.13 had been paid on the principal, reducing the balance owing thereon to $74,500.00 but there was some deliquency in the payments on principal which had become due.

In negotiating this sale, Nephi furnished William a statement of the business of the corporation for 1943, 1944 and the first four months of 1945. This statement showed a gross income of $13,590.00 for 1943, $17,501.00 for 1944, and $7,932.00 for the first four months of 1945, which if continued at that rate for the year would amount to $22,-796.00. It is evident that at the time of the sale the income of this property was being increased even under the old management. This statement showed a total payment on the mortgage for 1943 of $8,820.00 after paying all operating expenses, including $1,864.92 as salary, presumably for Nephi, and for 1944, a payment on the mortgage of $9,-243.62 with salary of $2,266.12, and a surplus above expenses and payments of more than $500.00, and for the four months of 1945 a payment on the mortgage of $3,477.50 with $1,274.16 salary. Thus it is evident that this property was paying substantial returns prior to the sale, although rundown and inffeciently managed as it was.

Shortly before and at the time of this sale, Nephi had two other corporations which owned real property. The Foothill Development Company owned property near the mouth of Parley's Canyon and the Hansen Holding Company owned some property on Center Street. He was about 77 years of age and there was much talk of the disposition of these properties among his family and some of his sons investigated the various properties to see where he should "get his out of." William had recently returned to Salt Lake City after living away for some time, with approximately $20,000 in cash to invest. The war was rapidly

drawing to a close and business was booming. This property was well located but rundown and out of repair, both the plumbing and the roofs frequently leaked and caused damages to the property of the renters, and Nephi had failed to get an additional loan of money on the property to make the necessary repairs. The faimly held a number of meetings and many individual discussions on these problems. William testified that he suggested to Lewis that he investigate the Sugar House property and see if he would like to take it over and that later, Lewis reported that it was not worth the mortgage against it and that his father first showed him the Foothills property but later his mother suggested that he help his father out on the Sugar House property and that later he helped his father make up the statement of an account of its financial operations above referred to. William was neither a stockholder or director of the Granite Holding Company. Lewis testified that when this deal was discussed in a family meeting, he said something should be done about the stockholders and William told him that was none of his business.

At the time of this sale, real estate was selling readily and at comparatively high prices. But this property was never offered for sale, either publicly or privately, to any one outside of the Hansen family. None of the stockholders outside of that family and the directors who Nephi could trust to carry out his wishes, were notified that a transfer was contemplated.

William agreed to pay $10,000.00 for the property. The record discloses payment of $8,780.24 and that by agreement with Nephi, William assumed $1,219.76 of corporate obligations. He knew of the resolution of the board of directors authorizing the sale and the payment to his father of $5,000.00 as back salary. Nephi not only took the $5,000.00 authorized but also the additional $3,780.24 which was paid later. William knew that his father dominated the board of directors and that they merely complied with his wishes. In the course of the negotiations for this deal, Wil-

liam agreed to give his father a job for an indefinite period and probably without regard to whether he could earn his salary for he did continue to pay him a $2,000.00 per year salary up to the time of the trial, although the record shows that at the time of the trial he was not competent to take the witness stand and had been in that condition for some time.

William took the property over on August 1, 1945, and immediately set out to repair and remodel the buildings. He consulted the tenants as to their needs in space and the necessary repairs and planned to meet their requirements as nearly as possible, and on that basis he entered into long term leases with very substantial increases in the rent, to begin at once. He made the necessary repairs and remodeled and changed the store space of some of the stores, including the remodeling of the basement, putting in an elevator from basement to upstairs in one part and various changes in the arrangements, but on account of this suit he was unable to complete the remodeling of the fronts of the stores and on that account he was compelled to reduce some of the rents. But they were still substantially above what they were when he took possession.

William was in possession of this property from August 1, 1945, to October 1, 1948, a period of 38 months, during which time he collected $97,686.00. This averages approximately $2600.00 per month. The court allowed him a credit of $68,439.95 as expenses of maintenance, upkeep and repairs and the payments made on the mortgage indebtedness, and gave judgment against him for $29,246.05.

The foregoing facts are not in dispute and were in substance found by the court, and in addition thereto the court found the following facts which the defendants contend are not supported by the evidence: That in July 1945, the property in question was reasonably worth $100,000.00; that the corporation never received the $10,000.00 purchase price but the same was paid by William to Nephi who

converted it to his own use. That the sale was not a bona fide sale but was made to transfer the title to the property out of the corporation to a member of Nephi's family who would enjoy the earnings thereof and furnish a future income therefrom to Nephi; that William knew all of the foregoing facts, knew the value of the property was more than he paid therefor, and that Nephi intended to convert the $10,000.00 to his own use, and that he completely dominated the board of directors and treated the corporation assets as his own property, and that the sale was made in violation of the rights of the corporation and its stockholders.

William freely admits that as long as he could remember, his father had treated the Granite Holding property as though it belonged to him; that they merely held director's meetings to approve his wishes, and that he did not take into consideration the rights of the outside stockholders. His attorneys argue that since these plaintiffs as stockholders allowed that condition to exist for a period of 25 years or more to William's knowledge, they are thereby estopped from now asserting their rights in the property. William also. testified that there were a number of family meetings held from the spring of 1945 to the time of this transfer, and many individual discussions of the division among the members of the Hansen family of the various properties under Nephi's control. Clearly he is chargeable with knowledge of his father's intentions and purposes in making this deal.

Defendant argues that the evidence does not sustain the court's finding that the property which was transferred was reasonably worth $100,000.00, or any more than he paid for it. An expert witness for plaintiffs analyzed the question of the value of this property from the standpoint of the replacement cost, the income produced and other sales in the neighborhood, and concluded that it was worth $115,000.00. Three witnesses for the defendants gave it as their opinion that under Nephi's manage-

ment it was not worth more than was paid therefor, but under a reasonably efficient management it would be worth $90,000.00. Of course, the reasonable market value of property is not determined by whether before the contemplated sale it is efficiently managed or not. In reaching their value, the defendants' witnesses stressed the possibility, at that time, that congress might extend rent controls to business property. This possibility, although it did not become a reality, was entitled to consideration as affecting the reasonable market value of the property, but we believe it was given undue weight by defendants' experts. All of the experts purported to use the financial statement which Nephi furnished William in determining the earning capacity of the property. Plaintiffs' expert concluded that the property was capable of producing a net earning of $9,000.00 per year, which is less than the financial statement shows was earned during the last year covered thereby, even under what all concede was inefficient management. One of defendants' experts seemed to claim that this statement showed a net earning of only enough to pay 4 per cent interest on $60,000.00 without any allowance for depreciation, but that statement shows that it not only paid 4 per cent interest on between $82,500.00 and $74,-500.00 but over a three and one-half year period the principal was reduced by $8,000. The result of plaintiffs' expert seems the more reasonable. The enlarged income which William produced demonstrated the possibility of the property. The preponderance of the evidence sustains the finding of the trial court on this question.

Thus, William agreed to pay the corporation only $84,-500.00 for property reasonably worth $100,000.00 or $15,-500.00 less than its value. He agreed to furnish his father $2,000.00 per year future income out of this property, although he was well along in years and his earning capacity nearing its end. Although that kind of property was in great demand and readily saleable, this deal was made between Nephi who had complete control and management

of the property and dominated the board of directors, and William, his own son, without offering it for sale to any one outside of the Hansen family, at a time when the family were holding meetings and discussing the division of the property which was in the control of Nephi, and the stockholders were being kept in the dark that a sale was contemplated. On the basis of these facts we conclude that the sale was fraudulent and made in bad faith.

A minority of the stockholders cannot control or direct the management of a corporation nor determine its policies as long as it acts within the scope of its rights, powers and privileges. But a fiduciary relation exists between the board of directors and the management of the corporation on one hand, and the stockholders on the other, and where the management is interested in any deal with the corporation so that its interests are contrary to that of the corporation, then its actions must be open and above board and their dealings must be carried on with the utmost fairness and good faith. In such cases courts of equity will carefully scrutinize the dealings of the management and set aside such transactions on slight grounds. *Noble Mercantile Co.* v. *Mt. Pleasant Co-operative Inst.* 12 Utah 213, 42 P. 869; *Victor Gold & Silver Mining Co.* v. *National Bank,* 15 Utah 391, 49 P. 826; *McIntyre* v. *Ajax Mining Co.,* 17 Utah 213, 53 P. 1124; *Ervin* v. *Oregon R. & Nav. Co.,* C. C., 27 F. 625.

Defendants do not particularly contend against the above doctrine but they do contend that no bad faith has been shown on the part of the defendants. This we have already answered. But defendants further contend that plaintiffs are estopped from asserting their rights in this corporation because they have stood by and allowed Nephi to manage it as his own property for more than 25 years. Much of this argument is directed against Lewis F. and Clyde Hansen who were directors at the time the sale was approved, and the Jensens who are the heirs of J. E. Jensen, also a director at that time. If those parties

were still parties, this argument might have some effect as to them, but the action has been dismissed as to them and the fact that they were at one time plaintiffs does not estop the plaintiffs from asserting their rights on behalf of the corporation.

As to the three remaining plaintiffs, there is not a word of evidence that they had any knowledge or notice of this deal until long after it had been consummated. Nor is there any evidence or claim that the management of the corporation under the domination of Nephi up to the time of this transaction, involved anything that was not within his legal rights and powers to do since he was the president, director and general manager of the corporation and controlled a majority of its stock. Under those circumstances, these stockholders were powerless to change the management of the corporation and therefore, cannot be estopped for not doing that which they had no power to do.

In the accounting, the court found that William had received $97,686.00 from the property during the time he was in possession. Partly under stipulation of the parties it allowed him credit against that amount for all his expenditures which it found was made for the benefit of the property, including the costs of remodeling as well as the necessary repairs, operating expenses, taxes, insurance and payments on the interest and principal of the note and mortgage. Under the facts in this case we think this method of accounting was equitable and fair to both sides. But defendants complain that the court refused to allow credit for some expenditures which were bona fide corporation obligations. Among them is the $10,000.00 which William paid to Nephi as the purchase price; $5,950.00 paid to Nephi as salary after the transfer, the reasonable value to the company of William's services in managing the business and labor in making the repairs and alterations, and $500.00 which William contributed to the Chamber of Commerce for the centennial celebration. Defendants com-

plain of the court's refusal to allow other items which we do not feel are necessary to discuss.

Of the $10,000.00 purchase money, $5,000.00 thereof was taken by Nephi in full payment of back salary in accordance with a resolution to that effect by the board of directors. Although there were no corporation records showing that this back salary was owing and the directors simply carried into effect Nephi's wishes, still he had operated the corporation's affairs for a long period of time and when money was scarce during the depression, his salary would be very meager. Under these circumstances, William was entitled to credit for this item. The same principle applies to the $1,219.76 to the extent that the court concludes that William paid bona fide claims against the corporation. As to the $3,780.24 which William paid to Nephi, the evidence is clear that Nephi simply converted it to his own use and he would be liable to the corporation therefor. But the court did not grant judgment against him for that sum, but refused to allow William credit for that payment. There is no evidence that William knew that his father intended to convert this money to his own use. On the other hand, William did not pay any corporation obligation in paying the money to Nephi. But Nephi was president and general manager of the corporation and had been transacting its business for many years, and the check was made to the corporation. Under these circumstances, William should receive credit for this money and the corporation look to Nephi to recover the same.

The $500.00 contributed to the Centennial Celebration, while not a legal obligation of the corporation was made for advertising and good will purposes. Since the property is being returned to the corporation it will receive the benefit thereof. It was probably a good investment and William should be given credit therefor.

William paid Nephi $5,950.00 as salary for his services in operating the property while he was in possession. To

the extent that he rendered valuable services to the corporation in the management of its property, William should be allowed credit for that payment. The court should hear evidence on this question but should not allow him credit for any more than Nephi's services were worth to the corporation.

A similar problem is presented in regard to compensation for the services which William rendered to the corporation in managing the property and making the repairs and remodeling the property. There is little difference in principle between his claim for his own services and payments which he has made for the services of disinterested persons, all of which were allowed by the court. There is a difference in that the problem is much more complicated in determining the value of William's services to the company since he has furnished no statement of the time he spent in manual labor and the time spent in the management, and the problem is further complicated in determining the reasonable value for his services in each capacity. But to the extent that he can show that his services benefited the corporation, William should be entitled to a credit. Of course, he has the burden of proving the value of his services to the corporation.

The judgment setting aside the conveyance to William is affirmed, and the trial court's decision on the accounting is affirmed except as to the items herein discussed: As to them the judgment as to the $5,000.00 back salary, the $3,780.24 which William paid to Nephi, and the $500.00 Centennial contribution is reversed; as to the other items wherein we have held that further evidence is necessary, the trial court is directed to grant a further hearing and the trial court is also directed to determine the necessary questions and to enter judgment in accordance with this opinion. Each party to stand his own costs on appeal.

PRATT, C. J., and WOLFE, J., concur.

LATIMER, J., concurs in result.

McDONOUGH, J., not participating.