## RUNSWICK et al. v. FLOOR et al.

No. 7254.   Decided August 9, 1949.   (208 P. 2d 948.)

See 19 C. J. S., Corporations, sec. 795. Sale of treasury stock to general public, see note, 52 A. L. R. 234. See, also, 13 Am. Jur. 311.

*McKay, Burton & White,* Salt Lake City, *Richard S. Johnson,* Salt Lake City, for appellants.

*Critchlow, Watson & Warnock,* Salt Lake City, *Jensen & Richards,* Salt Lake City, for respondents.

LATIMER, Justice.

This is a suit to set aside an alleged fraudulent sale of 150,000 shares of treasury stock in the New Quincy Mining Company to defendant Nick Floor. Incidentally involved was a requested review of certain corporate proceedings in which Floor received payment of certain sums of money for expenses which appellants claim were not chargeable against

the corporation. The trial court upheld the sale and apparently approved the allowance of the expense items. From the judgment as rendered, plaintiffs have appealed.

This is a companion case to the three cases of *Floor* v. *Johnson*, 114 Utah 313, 199 P. 2d 547; *State ex rel. Kahn* v. *Johnson*, 114 Utah 333, 199 P. 2d 556; and *New Quincy Mining Co.* v. *Johnson*, 114 Utah 342, 199 P. 2d 561, which were pending in this court at the time the instant case was tried in the court below. We suggest that the reader refer to those cases for the facts leading up to the feud which divides the rival groups of directors. For a number of years, certain of the important stockholders of the New Quincy Mining Company have been divided into two rival factions. Appellant, M. B. Johnson, is one of the dominant figures in the group which we designate as the "Johnson Group" and respondent, Nick Floor, heads the other, identified herein as the "Floor Group." The Johnson Group were in control of the company for a considerable number of years prior to 1946. Floor was a member of the board of directors with that group from 1934 to 1941. Later on he became dissatisfied with the manner in which the company was being operated and began to solicit the support of other stockholders in order to replace the directors of the company with a group sympathetic to his method of operation. He was unable to engage the support of enough stockholders to seriously threaten the Johnson group until 1946. Prior to the annual election of officers for that year, he had secured enough proxy votes to assure the election of his group unless 200,000 treasury shares issued by the Johnson group just prior to that election were to be counted. It appeared that several days prior to the 1946 election, the then directors issued 200,000 shares of the company's treasury stock to two individuals under a purported contract, one of the terms of which permitted a member of the Johnson group to vote the stock at the election for 1946. By voting the newly issued shares at the annual election, the Johnson group was supported by a majority of the stock present and thereupon

declared themselves elected although the Floor group and their supporters had polled a majority vote if the disputed 200,000 shares were not legally issued. Proceeding on the theory that the 200,000 shares had been fraudulently issued and therefore could not be counted, the Floor group commenced a suit in equity to cancel and set aside the sale of the 200,000 shares of treasury stock. Two other proceedings, one in mandamus and the other in quo warranto, arose out of the same transaction and dispute as to which of the rival directors had been rightfully elected to office. In each of these cases the trial court granted the relief prayed for by the Floor group, and we affirmed its decision in each instance.

The present dispute arose while those cases were still pending. The Floor group had organized their board of directors and elected Floor as president. There was no money in the treasury with which to commence operating the mine or to meet certain current obligations and the new board of directors met on July 7, 1947, to consider various ways and means of raising necessary operating funds. The directors present discussed the relative merits of three possible solutions, viz., levying an assessment, offering treasury stock to shareholders on a pro rata basis at a fixed price per share and offering treasury stock to one ore more purchasers without first offering it pro rata to all shareholders. The Floor directors adjourned this meeting without reaching any definite conclusion and counsel for the Floor directors was instructed to inquire into the procedure required by law to sell treasury stock pro rata to existing shareholders. A meeting was called on July 17, 1947, for the purpose of determining which of the proposed methods of raising funds should be adopted. Present were six of the seven directors. A report prepared by counsel was read advising the directors that they could sell treasury shares to any person for a fair price without first offering it to all shareholders on a pro rata basis but that if they should elect to offer the stock to more than three persons, share-

holders or strangers, it would be necessary to make the offering in accordance with pertinent provisions of the Securities and Exchange Act and regulations issued thereunder. Defendant Floor thereupon stated that because of the urgent need of cash with which to begin operation of the mine before winter, he would offer to buy 150,000 of the company's treasury shares at twelve cents a share payable $2,000 upon the acceptance of the offer, $10,000 upon the issuance and delivery of certificates for 100,000 shares of stock and $6,000 within ninety days from date of acceptance.

Floor then left the room in which the meeting was being held to permit the other members of the board to accept or reject his offer. After some discussion, four of the five remaining directors voted in favor of its acceptance. The other director present preferred to remain neutral and refused to vote either way. One other director, who did not attend the meeting, later testified he was opposed to the sale and believed a reissue of treasury shares should be offered pro rata to all shareholders. However, the company's articles of incorporation provided that treasury stock might be bought or sold upon the affirmative vote of four directors. In accordance with this provision, four directors had voted to accept Floor's offer, the cash was paid in accordance with the terms of the offer and the stock was issued. Appellant, M. B. Johnson, several days later discovered that the sale had been agreed upon and this action was commenced.

The principal issue to be decided by this court is as to the validity or invalidity of the sale of the treasury shares to defendant Floor. In proceeding to determine this question, it should initially be pointed out that the shares of stock involved had been once fully paid for and had been returned to the treasury of the company. Officers of a corporation may reissue this type of stock for value and in good faith without first offering it pro rata to existing shareholders. *Borg* v. *International Silver Co.,*

D. C. S. D. N. Y., 11 F. 2d 143 affirmed 11 F. 2d 147; *Crosby* v. *Stratton,* 17 Colo. App. 212, 220, 68 P. 130, 133; *Hartridge* v. *Rockwell,* R. M. Charlt. Ga., 260. We quote from *Borg* v. *International Silver Co.,* supra [11 F. 2d 151]:

"The distinction may appear tenuous, but rests upon the effect which a new issue has upon the voting control of the company. When a person buys into a company with an authorized capital, he accepts that proportion of the voting rights which his purchase bears to the whole. This applies certainly so far as the other shares are issued at the same time, and perhaps, also, though they are issued much later. But treasury shares have by hypothesis once been issued, and have diluted, as it were, the shareholder's voting power ab initio. He cannot properly complain that he is given no right to buy them when they are resold, because that merely restores the status he originally accepted. All he can demand is that they shall bring to the corporate treasury their existing value. If they do, his proportion in any surplus is not affected. However, when the capital stock is increased beyond the original amount authorized, the voting power is diluted along with it; the shareholders who had not originally bought into so large an issue may insist that the old proportions be observed. To deprive them of their right of pre-emption is to change their contract. At any rate it is only on this theory that any right of pre-emption exists, and since the shares at bar were never bought to be retired, and the capital was not increased, the right does not exist."

Hence, the sale of the 150,000 shares to Floor was not objectionable by reason of the fact that the shares were not first offered to existing shareholders on a pro rata basis.

Appellants next argue that the issuance of treasury stock to the president and director of a corporation is an act subject to the close scrutiny of the court, and the facts present in the instant case required the trial court to set aside the sale. While the rule contended for is no doubt the majority rule, it must be remembered that so long as corporate officers act fairly and in good faith, they are not precluded from dealing or contracting with the corporation merely because they are its officers. *McIntyre* v. *Ajax Mining Company,* 28 Utah 162, 77 P. 613, 616. This court, in the cited case, states the rule to be as follows:

"There is no sound principle of law or equity which prohibits one or more of the directors of a corporation from entering into contracts and dealings with the corporation, provided they act in good faith, and provided there is a quorum of directors on the other side of the contract, so that the vote of the interested director is not necessary to the adoption of the measure; and even in the latter case the contract is good in law."

Appellants concede the soundness of the foregoing rule, but seek to escape its effect by contending the Floor directors, in approving the sale, acted unfairly and in bad faith because appellants claim the sale was made for the purpose of perpetuating the control of the corporation in the Floor group. The record, however, does not substantiate the claim. The facts concerning whether Floor gained control of the corporation by the acquisition of the additional shares are these: Before the sale, Floor and the six other directors of his group owned a total of 244,000 shares, of which Floor owned 213,500 shares. At that time there were 1,007,521 corporate shares outstanding. Thus, before the Floor group could control the affairs of the company, they would be required to vote at least 503,762 shares or more than twice the number owned by them. After the sale of the 150,000 shares to Floor, he and his family had acquired 370,000 shares which together with the shares of the other directors amounted to a total of 401,100 shares. At the same time, the Johnson group, consisting of eight persons, owned 492,307 shares, or 91,207 shares more than the Floor group. The number of outstanding shares after the sale were 1,157,521 and to be elected or retained in office, the Floor directors would be required to obtain the vote of 177,662 additional shares, whereas, the Johnson directors needed the vote of only 86,455 shares to get control. From these figures it becomes obvious that neither faction could vote itself into office. Each must gain the support of other shareholders in order to prevail at the annual elections and, of the two factions, the Johnson group enjoyed a distinct advantage in the fewer number of additional votes necessary for it to gain control. Under these

circumstances, it is reasonable to assume that the group capable of presenting the most attractive plan of operation to stockholders not affiliated with either faction could expect to be elected to office, and although Floor's voting power was substantially increased by the sale, it cannot be said that he acquired control of the corporation by his purchase of the 150,000 shares. We conclude that the sale is not objectionable on this theory.

Appellants contend another reason why the sale must be set aside is that at least one and perhaps two of the directors voting in favor of accepting Floor's offer were disqualified because each stood to gain financially from the sale. It appears that director Glenny had audited certain of the corporation's books at the request of Floor sometime in 1944 or 1945, had received 1,000 shares of stock in part payment for the work he had done and had been assured by Floor that he would receive $200 cash from the corporation when and if the money became available. Subsequent to the sale, Glenny's claim was approved for payment and on August 5, 1948, he received a check from the corporation for $200. Appellants reason in support of this contention that at the time Glenny voted in favor of accepting Floor's offer, he could anticipate receiving this $200 from the proceeds of the sale; that his holdings in the corporation were slight (1,000 shares) ; that his vote was self-serving in that his primary interest was to acquire the $200 cash; and that under these circumstances his vote should not be counted. The fact that Glenny looked to the corporation for payment for services performed did not disqualify him. The law does not prevent a director from voting upon a measure designed to provide working funds for a corporation merely because he claims to be a creditor of the corporation. In voting for financial assistance Glenny did not violate his position as a fiduciary because the payment of his claim was a separate and distinct matter to be subsequently approved or rejected by the company and had little or nothing to do with the manner in which the corpor-

ation obtained funds to continue operations. In the instant case the board of directors voted to allow payment of the $200.00 to Glenny after the company had acquired the proceeds from the sale, but appellants do not contend that Glenny participated in the vote or discussion on this matter and we need not assume that he did. The showing made does not suggest bad faith and falls far short of establishing that Glenny was disqualified to vote on the proposed sale.

The other director said to be disqualified by reason of a personal interest in the sale is John Cairo. At the trial he admitted he wanted more New Quincy stock and that he had endeavored for some time to persuade Floor to sell him some of his personal holdings in the company, but that Floor, at that time, had preferred to retain all the New Quincy stock he owned. It appears that both men had long been friends, that Floor sold 11,000 shares to Cairo within a week after his purchase of the 150,000 shares and that Floor admitted he had to sell some of the 150,000 shares in order to raise enough money to complete payment of the $18,000 he owed the company under the terms of the purchase. Conceding the rule that a director, as a fiduciary, will not be permitted to represent himself as an individual and the corporation as well in a transaction in which his interest is adverse or antagonistic to that of the corporation, the facts relied upon by appellants are insufficient to require the court to find that Cairo had a personal interest in the sale to Floor which would disqualify him from participation in the vote. They do not evidence a preconceived plan to permit Cairo to increase his holdings or that Cairo had any reason to believe Floor would sell him any part of the treasury shares if the sale were completed. Apart from appellant's suspicion that Cairo voted as he did in order to secure additional shares, there is nothing to indicate that he did. Consequently, we overrule appellants' contention that the facts and circumstances present in the record require the disqualification of Cairo's vote on the sale.

The next matter of which appellant complains is that certain payments made to Floor should not have been authorized by the Board of Directors. Under the issues as framed, such approval could only be important if it was a fact or circumstance which, when considered ■ with others, evidenced a preconceived plan or scheme to sell the stock to Floor for the purpose of giving him control of the Company. The evidence shows and the trial court apparently found that the expenditures made by Floor were, for the most part, made necessary by the litigation previously mentioned in this opinion. A shareholder who successfully prosecutes a representative suit is entitled to reimbursement for the expense of litigation he has borne. Fletcher Encyclopaedia Corporation, Vol. 13, Section 6. Those expenditures which were not made necessary by the litigation were such that the Board of Directors acted within permissible limits in approving their payment.

The expenditures being for appropriate corporation purposes, and their payment having been authorized some time after the sale of the stock, and not as part of it, we are unable to discover any reason why the subsequent action of the Directors becomes improper, reverts ■ back to the sale of the stock and taints the sale with fraud. Even were we to engage in the most exaggerated apprehensions, we still could not consider the decision of the Directors in approving the sale of stock as being founded in bad faith, because part of the proceeds eventually found their way back to Floor to reimburse him for moneys advanced for the benefit of the corporation.

Judgment is affirmed. Costs to respondent.

PRATT, C. J., and WOLFE, WADE and McDONOUGH, JJ., concur.