483 P.2d 897

ROCKET MINING CORPORATION, a Utah corporation, and Pioneer Carissa Gold Mines, Inc., a Wyoming corporation, Plaintiffs and Appellants,

v.

Rulan J. GILL, Lenore M. Gill, Ray Gill, Angelo M. Billis, Herman F. Lund, and T. W. Billis, Defendants and Respondents.

No. 12174.

Supreme Court of Utah.

April 8, 1971.

Walter P. Faber, Jr., Salt Lake City, for plaintiffs-appellants.

Pugsley, Hayes, Watkiss, Campbell & Cowley, David K. Watkiss, and Glen E. Davies, Salt Lake City, for defendants-respondents.

CROCKETT, Justice:

The plaintiffs, two mining corporations, sued the defendants, former officers of the

Rocket Corporation, to recover for alleged violation of fiduciary duties in mismanagement and improper distribution of corporate assets to certain of the defendants. Upon plenary trial the district court found the issues in favor of the defendants and against the plaintiffs, from which they appeal.[1]

All of the defendants were connected with the organization of the Rocket Mining Corporation in 1955, or in the management and operation of its affairs thereafter. After its organization, Rocket, with SEC approval, made a public offering of 30,000,-000 shares of stock at five cents per share, which was later reduced to one cent per share. After efforts to sell this stock through two brokerage firms had failed, the public offering was withdrawn in January, 1956. Because of the limited amount of capital that had been obtained through the public offering, it became necessary for the company to raise additional funds with which to operate. It was in the face of this necessity that certain of the men interested in the Rocket Corporation made advances of money the repayment of which later became a pivotal part of this controversy and lawsuit. Rulan J. Gill, its President, made advances totaling $24,694.83; and A. M. Billis and Herman F. Lund loaned a total of $48,330 which they obtained from the sale of their stock. Forty-

five thousand dollars of this was used on a deal for the purchase of a mill at South Pass, Wyoming, which belonged to the other plaintiff corporation, Pioneer Carissa Gold Mines.

At about that time Rocket Corporation, through Rulan J. Gill and Angelo M. Billis, obtained some lease interests in mining claims known as the "Rim Group" in Wyoming, which included a drilling commitment and a royalty agreement. Although it was indicated that there was a "substantial body" of ore blocked out, it appeared that in order to "open the pit" and operate properly a quarter of a million dollars would be necessary. This Rocket did not have. After unsuccessful efforts to raise more money, an underwriting agreement was finally projected by which all holders of Rocket stock would place it in escrow during the term of the underwriting. Pioneer Carissa, which had received a substantial amount of Rocket stock as a part of the purchase price for its mill, refused to cooperate by so escrowing its stock. It is the position of the defendants that this prevented them from financing the further development of the claims, and that at a board meeting held 26 December, 1957, they resolved to sell the "Rim Group" of claims for $130,000 and use the money to pay off certain obligations of Rocket, including taxes, attorney's fees and the loans referred to

---

1. That we accept the view of the evidence and the facts. as adopted by the trial court, see Bramel v. Utah State Road Comm., 24 Utah 2d 50, 465. P.2d 534.

above. When disagreement continued with the Pioneer Carissa people, the defendants Rulan J. Gill and Angelo M. Billis sold out their stock in Rocket to a Mr. Roy Cram for "somewhere between six and ten thousand dollars." In 1960, the officers and stockholders of Pioneer Carissa sued the Rocket Corporation for nonperformance of the mill purchase contract. Subsequently, there was a merger of those two corporations who join in this suit in an attempt to recover, as herein explained, from the defendants, former officers of Rocket Corporation.

The principal issue in this suit arises from plaintiffs' contention of the invalidity of the action of the board of directors of Rocket Corporation at the meeting just referred to, held 26 December 1957, resolving that Rocket should sell the "Rim Group" of claims and devote the proceeds to paying its debts including to these defendants. In their brief plaintiffs assert:

> *Because there were only four directors of an authorized board of seven* and the defendants as directors were personally interested in and voted for distribution of the $130,000, *there could not be a proper quorum present,* and any such distribution was unlawful, and defendants are therefore liable for the amount so distributed.

The first question relating to the board is as to the proper number of directors. The Rocket articles of incorporation had been amended in February, 1957 (thus prior to the time of the meeting just referred to) to increase the number of directors from four to seven. But the vacancies had not been filled. There is some division among the authorities as to whether newly created vacancies which have not been filled should be counted in determining whether there is a majority of directors. We consider the better view to be that in the absence of a showing of fraud or chicanery of some sort, until the newly created vacancies have been filled, they should not be counted.[2]

We proceed on the premise that there was a properly constituted board of four directors. In reference to the question as to whether there was a proper quorum to transact business, Sec. 16–10–38, U.C.A. 1953, provides that such a quorum shall consist of: "a majority of the number of directors fixed by the bylaws, or * * * stated in the articles of incorporation * *." We accept the proposition advocated by the plaintiffs that in matters where a director has an interest adverse to the corporation he cannot participate to bind the

---

2. In 2 Fletcher Cyclopedia Corporations, § 421 at 276 it is stated: "Moreover, newly created directorships which are unfilled cannot be counted in determining the number necessary to constitute a quorum of the Board of Directors."

corporation.[3] For this reason, one of the four directors, Rulan J. Gill, the company President, was disqualified to act because he did in fact receive $42,000 of the $130,000 ultimately realized from the resolution.

As to the other three directors the situation is different. They received no direct benefit, though they were relatives of the defendants who did. It has properly been held that the mere fact that a director is the wife (Lenore M. Gill, wife of Rulan J. Gill) of one so interested does not disqualify her from voting as a director.[4] The same reasoning applies to T. W. Billis, who was the brother of A. M. Billis, and to Ray Gill, who was the father of Rulan J. Gill. The plaintiffs have cited no cases to the effect, nor are we aware of any which hold that mere family relationship to one interested in a transaction disqualifies or relieves a director from performing his duties. There being three of the four directors who had no direct personal interest in the resolution, the trial court was justified in rejecting the plaintiffs' contention that the action of the board was invalid.

The next charge plaintiffs make against the defendants claiming violation of their fiduciary duty to Rocket Corporation is that their action of December 26, 1957, was beyond their authority in that it constituted a disposal of the "vital corporate asset" which was nugatory of its existence and purpose. We appreciate that consistent with the duty of the officers and directors to sustain and preserve a corporation rather than to destroy it, there is authority to the effect that the officers may not so dispose of its property as to defeat the purpose of its existence. It is stated in 2 Fletcher Cyclopedia of Corporations, § 518 at p. 562, that:

> * * * in the absence of express statutory authority, neither the directors nor a majority of the stockholders *of a prosperous and going corporation*, nor both together, have power to dispose of the entire property of the corporation, or even so much of it as renders the corporation unable to continue business and carry out the purpose of its formation.

Assuming the correctness of that statement, it will be noted from the emphasized language that the rule does not fit the circumstances of this case. The authorities make a distinction between a profitable and going concern and one which is in financial difficulties.[5] The text at 5 A.L.R. 932 states:

> *When the corporation is unprofitable or in failing circumstances the directors are*

3. 19 Am.Jur.2d, Corporations, § 1128; Colorado Management Corporation v. American Founders Life Insurance Co., 145 Colo. 413, 359 P.2d 665 (1961); Adams v. Mid-West Chevrolet Corp., 198 Okl. 461, 179 P.2d 147 (1947).

4. Cuneo v. Giannini et al., 40 Cal.App. 348, 180 P. 633.

5. See 5 A.L.R. 930, 60 A.L.R. 1210, and cases cited therein.

*given a wider range of control and may sell all the property without the consent of the stockholders as long as they are acting in the best interests of the corporation.*

The sound rule appears to be, as stated by the Illinois court:

> In the absence of express restrictions, the directors of a corporation, as managers thereof, have the power to sell and convey all of its property, without the consent of the stockholders, when it becomes necessary to do so to pay its debts.[6]

The plaintiffs' further contention, somewhat related to the point just discussed, is that the defendants failed in their duty as corporate officers by allowing assets to be dissipated, lost or stolen. In regard thereto it is sufficient to quote the trial court's finding:

> * * * the evidence proponderates in favor of defendants as to any loss or theft of corporate assets and, of course, the sale of defendants' individually owned shares was not an unlawful distribution of *corporate* assets; nor was there a showing of "abandonment" of the corporation.

Plaintiffs next make a contention of a different character: that the defendants violated their fiduciary duty to the Rocket Corporation and it stockholders in this: that while the public offering of Rocket stock was extant, and before it had been withdrawn, the defendants took advantage of a rise in the market price of the stock, and instead of selling the stock of the corporation, sold their own stock for a profit, and made personal loans to the corporation, thus placing encumbrances upon it, the payment of which to the defendants, as hereinabove set forth, resulted in the failure of Rocket Corporation.

The only evidence presented suggesting that the public offering of the stock had not been withdrawn is a letter from the SEC dated April 2, 1956, which stated:

> There is some indication in our files that no securities are presently being offered. If the company does not desire to offer the unsold shares under regulation A, a withdrawal of the notification as to such unsold shares should be forwarded to this office.

This revelation of "some indication" in the files of the SEC certainly comes a long way from being conclusive proof that the public offering of Rocket Corporation's stock had not been withdrawn. On the other hand, plaintiffs' own brief to this court states the inconsistent position that the public offering had in fact been withdrawn. They state:

> * * * the offering [public offering] was voluntarily terminated by the defendants in January, 1956 * * *.

6. Beardstown Pearl Button Co. v. Oswald, 130 Ill.App. 290.

and further

> After stopping the public offering in January, 1956, defendants sold some of their own stock over the counter prior to April 2, 1956, at prices in excess of the public offering * * *.

Inasmuch as the defendants' sales of stock were in March and April, 1956, and thus after the public offering had been withdrawn, we know of no reason why the plaintiffs can complain that the defendants sold their own stock to third parties willing to purchase it. The absence of proof that Rocket suffered any damage from the defendants' sale of their own stock supports the trial court in rejecting plaintiffs' contention. On the other hand, it would seem that Rocket benefited, indirectly at least, because it obtained from the defendants some interest-free loans from the proceeds of these sales.

There is a general observation to be made which has a bearing upon each of the issues discussed above and upon the whole situation in this case. The trial court adopted the view that the defendants had in good faith advanced the money represented by the loans in question to the Rocket Corporation to assist in carrying on its affairs. When this has been done, in the absence of fraud, deception or misrepresentation, a contract with the corporation would not have been void, but only voidable, and in any event honesty and fair dealing would have required restoration of the money actually received by the corporation.[7] In this connection it is further pertinent to observe that the loans to the corporation by defendants, and their sales of stock, which the plaintiffs charge as misdoings, all happened many months before those who now own the controlling interest in the Rocket Corporation acquired their stock in it, and several years before this action was brought.[8]

Judgment affirmed. Costs to defendants (respondents). (All emphasis added.)

CALLISTER, C. J., and TUCKETT, HENRIOD and ELLETT, JJ., concur.

---

7. See Baker v. Glenwood Mining Co., 82 Utah 100, 21 P.2d 889; Niles v. United States Ozocerite Co., 38 Utah 367, 113 P. 1038; 3 Fletcher Cyclopedia Corporations, Secs. 952, 953; 19 Am.Jur.2d, Corporations, 1298; and see also Cox v. Berry, 19 Utah 2d 352, 431 P.2d 575, cited by the plaintiffs themselves in regard to the fiduciary duty of the directors to the shareholders, but which is actually indicative that the directors may repay a loan to an officer of the corporation.

8. The trial court having resolved the issues herein on the merits in favor of the defendants, and our affirmance thereof, obviates the necessity of considering problems as to the Statute of Limitations, Sec. 78-12-27, U.C.A.1953, which provides that: "Actions against directors or stockholders of a corporation * * * must be brought *within three years after the discovery*, by the aggrieved party, of the facts upon which * * * the liability accrued * * *."