C & Y CORP., a Utah corporation; Robert A. Condie, an individual; and James Yarter, an individual, Plaintiffs, Appellants, and Cross–Appellees,

v.

GENERAL BIOMETRICS, INC., a Delaware corporation; Ventana Growth Fund, a California limited partnership; and Thomas Gephart, an individual, Defendants, Appellees, and Cross–Appellants.

No. 940340–CA.

Court of Appeals of Utah.

May 18, 1995.

Paul T. Moxley, Robert S. Campbell, Jr. and Robert E. Mansfield, Salt Lake City, for appellants.

Mary Anne Q. Wood, Anthony B. Quinn and Richard G. Wilkins, Salt Lake City, for cross-appellants General Biometrics.

Paul M. Durham and J. Mark Gibb, Salt Lake City, for appellees Ventana & Gephart.

## OPINION

Before BENCH, GARFF,[1] and JACKSON, JJ.

JACKSON, Judge:

C & Y Corp. (C & Y), Robert Condie, and James Yarter appeal the trial court's dismissal under Utah Rule of Civil Procedure 41(b)[2] of their breach of contract claim against General Biometrics, Inc. (GenBio), Ventana Growth Fund (Ventana), and Thomas Gephart. GenBio, Ventana, and Gephart cross-appeal the trial court's dismissal under Rule 41(b) of their claim that Condie and Yarter breached their fiduciary duties as directors of GenBio.[3] We affirm.

## BACKGROUND

GenBio researches, develops and markets immunological tests to diagnose or screen certain infectious diseases and genetic conditions. During the time relevant to this case, the bulk of GenBio's research and administrative functions were performed at its headquarters in La Jolla, California. However, a division of GenBio, Microbiological Research Corporation (MRC), was located in Bountiful, Utah. MRC maintained the technology for one of GenBio's main product lines—immunofluorescent antibody tests (IFA). MRC also manufactured reagents for Immunodot diagnostic tests (Immunodot).

In 1987, GenBio's highest priority in securing its future was further development of the fledgling Immunodot, considered state-of-the-art technology. Immunodot was expected to eventually replace the antiquated IFA technology, which was in "harvest mode"[4] and provided GenBio's only profits. Because those profits alone could not financially support GenBio, it relied heavily on funding from stock purchases and loans made by Ventana, an investment firm. Gephart and Duwaine Townsen were Ventana's managing partners and had great control over GenBio's board of directors and operations.

Sometime in 1989, John Gordy, GenBio's president, devised a plan to sell MRC to generate operating capital for GenBio as it continued developing Immunodot. Gordy presented his plan in the November 1989 meeting of GenBio's board. At that time, the board consisted of Gordy, Townsen, Condie and Yarter. All but Condie were present in the November meeting. The board minutes reflect the directors' response to Gordy's proposal: "A discussion was had concerning the possibilities of selling the Company's MRC division. It was the sense of the Board that Mr. Gordy should investigate the possible sale of this division and should bring any potential offers to the Board for further discussion and decision." On March 22, 1990, the entire board executed an addendum to the November 1989 minutes. In pertinent part, the addendum reads:

> RESOLVED, that, in the event of the sale of the Company's Utah division (MRC), John T. Gordy will be remunerated for his efforts on the Company's behalf according to the following schedule:

---

1. Senior Judge Regnal W. Garff, acting pursuant to appointment under Utah Code Jud.Admin. R3–108(4).

2. Rule 41(b) reads in pertinent part:
 After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff. . . .
 Utah R.Civ.P. 41(b).

3. The provisions of Rule 41(b) "apply to the dismissal of any . . . cross-claim." Utah R.Civ.P. 41(c).

4. The term "harvest mode" implies GenBio's belief that it could not further develop IFA technology, but would market it "as is" until it was superseded by other technology, like Immunodot.

MRC is sold for less than $500,000; no remuneration.

MRC is sold for $500,000 or greater; Mr. Gordy receives five (5%) percent of the net sale amount up to a maximum of Fifty Thousand ($50,000) Dollars.

The trial court found the board also pre-authorized the sale of MRC for $500,000 or more at the November meeting and Gephart had approved such a sale before the meeting.

For the next six to eight months, Gordy "regularly marketed the sale of MRC" and "met regularly" with Gephart and Townsen to report on his efforts. GenBio made listing agreements with Cleary Berlew, Waldon & Associates, and Ventura, which was a business associate of Gephart. The agreement with Ventura was entered at Gephart's request.

Meanwhile, sometime after the November 1989 board meeting, directors Condie and Yarter became interested in possibly buying MRC. Gordy testified:

[A]t some point—I'm not positive—it was December, January-point, Mr. Yarter even asked me if I would be interested in joining a group to buy MRC. And I don't think I said yes and I don't think I said no. I just said I'll tell you it's a good little company. But as you know, it's a maturing industry. But it's not going to die off, you know, in the near future. I think it would be a really good investment.

Indeed, MRC's gross profits for the first part of 1990 were impressive, "equal[ling] or exceed[ing 1989's] total on a little over half the sales volume."

On May 2, 1990, Condie and Yarter preliminarily discussed their mutual interest in possibly buying MRC. At that time, both were still on GenBio's board and Yarter was chairman of the board. The next day, Condie wrote Yarter a letter:

Following up on our conversation of Wednesday May 2nd I went out to [MRC] and talked to Bruce Ashton our manager at that facility.

There appears to be a great opportunity to increase the value of this opperation [sic] if we proceed to purchase it. Moral [sic] is not very good, [sic] I'm sure this comes from the feeling they are only needed to provide cash flow for the operation in San Diego.

The present facility has been housed in three different buildings for at least the last six years. A move to a single facility would offer great economy of operation and could possibly be done for a reduced rental.

If your travels permit it may be very helpful to spend a day here in Salt Lake going over the facility and the opportunity it offers.

. . . .

I think it is imparative [sic] that Townsen has an understanding with John about Johns' [sic] future and future of Gen–Bio within the time frame of next year.

I look forward to working with you. As soon as I receive the material we discussed I will begin working with the banks in Salt Lake City.

After receiving this letter, Yarter sent his personal financial statement dated May 8, 1990 to Condie to use in exploring financial backing for buying MRC. Yarter attached to the statement a note, which reads in part: "I have asked John [Gordy] to send you the financial statements on MRC from GenBio. I'll give you a call latter [sic] this week to see how you make out. The purchase price would be between 500,000–$1,000,000—probably someplace in between the longer it sits without an offer."

On May 24, 1990, Condie sent Yarter a letter with the following statement at the bottom:

I talked to Bruce Ashton today concerning the [MRC] opportunity. He feels very positive about the potential of increased sales. Gull Laboratories, a Salt Lake firm is in the same field we are in. Three years ago their sales were approximately 1 million dollars. Their 1990 sales will be 4.2 million. Most of the increase comes from the European market. There is no reason we cannot accomplish the same. (I have not indicated our desire to buy [MRC] with Bruce).

Yarter became president of GenBio in June 1990. During the summer of 1990,

Condie gathered financial information about MRC. Regarding this information, the trial court found: "The information Mr. Condie or Mr. Yarter obtained in making their decision to pursue the purchase of the MRC Division was not of a confidential nature and was the same information which had been sent to other potential purchasers." The trial court further found: "Information relating to the MRC Division, including financial information, was segregated for the express purpose of providing this information to prospective purchasers." Also during that summer and fall, Condie and Yarter were involved in preliminary discussions about moving MRC to a more cost-effective facility.

On November 29, 1990, Yarter submitted a letter in which he resigned as a director and chairman of the board of GenBio effective December 1, 1990. On December 13, 1990, Condie made a written offer to purchase MRC addressed to Townsen. The first paragraph states: "I talked to Jim Yarter yesterday December 12, 1990. He indicated that he had discussed with you the possibility of my group purchasing the assets of MRC from General Bio–Metrics." The letter goes on to state terms of an offer.

Sometime before the end of the year, Gephart, not Townsen, telephoned Condie to reject the offer but showed interest in Condie's proposal. Condie resigned his directorship effective December 31. Gephart and Condie spoke on the phone again sometime before January 7, 1991. The trial court found that during their conversation Gephart "offered to sell MRC for $500,000 at $400,000 down with the balance in 60 or 90 days." On January 7, 1991, Condie responded to Gephart with the following letter:

Our group has authorized me to accept your offer to sale [sic] to us the assets of MRC from GenBio for $500,000.00. Our purchase will be as follows:

A. Purchase price $500,000.00
B. Cash—Upon closing $350,000.00
C. 75 days after closing $ 75,000.00
D. 120 days after closing $ 25,000.00

It is necessary to have written acknowledgement of our agreement by Friday, January 11th. Upon receipt of this acknowledgement, I will have our attorneys draw up a written contract of purchase.

To discuss concerns bred by Condie's "acceptance"—i.e., the obvious mathematical discrepancy—Gephart and Condie spoke again on either January 8 or 9. On January 10, 1991, Gephart wrote to Condie a letter reading in part:

Pursuant to your January 7 correspondence and to our telephone conversation yesterday afternoon, I would like to provide a written acknowledgement of the agreement regarding the sale of assets and liabilities of MRC from GenBio for $500,-000. As I mentioned, we generally agree with your proposal.

Please note, however, that the capital amounts in Sections (B), (C) and (D) of your proposal only total $450,000. In this regard, I would like to modify section (B) to be increased to $400,000—instead of $350,000—so that the total will add up to the entire $500,000. I will plan to take this proposal to the GenBio Board of Directors within the next week, to receive formal approval.

The parties entered a period of rocky negotiations over the terms of what was to be a final purchase agreement. Over the next two months, the attorney for Condie and Yarter drafted three versions before negotiations broke down for good. On March 6, 1991, GenBio's board rejected the third and final draft of the agreement. Condie and Yarter continued to insist on performance of the "contract" and even tendered their own performance on March 18 according to the closing terms set out in the third draft. GenBio did not show up for the "closing." Consequently, Condie, Yarter, and C & Y—the corporation they formed specifically for the purpose of acquiring MRC—filed suit against GenBio, Ventana, and Gephart for breach of contract. GenBio counterclaimed that "the secret plans of its former directors ... to acquire the corporation's only profitable assets breached their fiduciary obligations."

Following presentation of Condie and Yarter's case-in-chief, the trial court granted GenBio's dismissal motion under Rule 41(b),

ruling on the merits.[5] Later, following presentation of GenBio's evidence on its counterclaim, the court granted Condie and Yarter's Rule 41(b) motion to dismiss, ruling on the merits.

## ISSUES

On appeal, Condie and Yarter raise a number of issues,[6] but we need only address one dispositive question: As a matter of law, did the trial court err in determining no contract existed for the sale of MRC from GenBio to Condie and Yarter?

GenBio raises two issues on cross-appeal: (1) Did the trial court err in finding Condie and Yarter did not breach their fiduciary duties and obligations of good faith and fair dealing as corporate directors; and (2) should Condie and Yarter be liable for GenBio's attorney fees under Rule 33(a) of the Utah Rules of Appellate Procedure?

## ANALYSIS

### I. Appeal

Condie and Yarter argue that their written and oral correspondence with Gephart regarding the purchase of MRC constitutes a contract. Concerning this issue, appellants do not challenge the trial court's findings of fact, but challenge only the trial court's legal conclusions. In reviewing Rule 41(b) dismissals, "we do not defer to conclusions of law but review them for correctness." *Southern Title Guar. Co. v. Bethers*, 761 P.2d 951, 954 (Utah App.1988).

■ In its conclusions of law, the trial court correctly stated the law applicable to this case: "It is not necessary that the contract itself contain all the particulars of the agreement. The crucial question is whether the parties agreed on the essential terms of the contract." *See Crismon v. Western Co. of N. Am.*, 742 P.2d 1219, 1221–22 (Utah

App.1987); 1 Arthur L. Corbin, Corbin on Contracts § 2.8(a) (1993); 17A Am.Jur.2d *Contracts* § 26 (1991). Stated another way, a contract does not exist without a "meeting of the minds" or "mutual assent." *See John Call Eng'g, Inc. v. Manti City Corp.*, 743 P.2d 1205, 1207 (Utah 1987). Regarding this requirement, "the intentions of the parties to a contract are controlling, and generally those intentions will be found in the instrument itself. However, if a writing is not sufficient to establish meaning, resort may be had to extraneous evidence manifesting the intentions of the parties." *Id.*

■ Accordingly, we first examine the writings between the parties. The January 7th letter from Condie to Gephart and the January 10th letter from Gephart to Condie are insufficient to conclusively establish the contractual intent of the parties. First, the January 7th letter characterizes the transaction as a sale of assets, while the January 10th letter calls it a "sale of assets and liabilities." Second, the January 7th letter establishes a $500,000 offer, yet proposes a payment schedule with amounts totaling only $450,000. The January 10th letter responds by requesting the payment schedule be reworked to equal $500,000. Finally, the January 10th letter notes Gephart's "plan to take [Condie's] proposal to the GenBio Board of Directors within the next week, to receive formal approval," suggesting only conditional acceptance of the proposal.

Having determined these letters do not conclusively establish the intent of the parties, we look to "extraneous evidence manifesting the intentions of the parties," *id.,* involving questions of fact. The trial court found "[t]he correspondence and draft agreements and additional testimony establish that the parties did not mutually agree on the contract essential terms." Because appellants do not challenge the trial court's factual findings, we must accept this finding as true.

---

**5.** Rule 41(b) reads, in pertinent part:
 If the court renders judgment on the merits ... the court shall make findings as provided in Rule 52(a).
 Utah R.Civ.P. 41(b).

**6.** Other issues raised by Condie and Yarter involve whether their offer was a "cash offer"

within the prior approval of GenBio's board, whether Gephart had authority to contract with them on behalf of GenBio, and whether the trial court's findings of fact and conclusions of law were fatally inconsistent. Because we find no contract existed, we need not address these issues.

Thus, we conclude that no contract existed between these parties because their minds did not meet on essential terms of the contract.

## II. Cross–Appeal

GenBio argues the trial court erred in determining that Condie and Yarter, as former directors of GenBio, did not breach their fiduciary duties to GenBio when they attempted to buy its MRC division. GenBio also does not challenge the trial court's factual findings. Instead, it asks us to review the trial court's legal conclusions and determination that the facts of this case do not give rise to a valid action for breach of fiduciary duty. *See State v. Pena*, 869 P.2d 932, 935–36 (Utah 1994).

### A. Standard of Review

■ As we stated in the previous section, in reviewing Rule 41(b) dismissals, "we do not defer to conclusions of law but review them for correctness." *Southern Title Guar. Co. v. Bethers*, 761 P.2d 951, 954 (Utah App. 1988). However, "while we generally consider de novo a trial court's statement of the legal rule, we often review with far less rigor the court's determination of the legal consequences of facts." *State v. Pena*, 869 P.2d 932, 937 (Utah 1994).

■ The degree of rigor with which we should review a trial court's breach of fiduciary duty determination is a matter of first impression in Utah. Using *Pena*'s metaphor, we must determine the size of the trial court's "pasture" in this case in which directors are alleged to have breached their fiduciary duties to a corporation. *See id.* at 938 ("[T]he real amount of pasture permitted a trial judge will vary depending on the legal issue. . . ."). In *Pena*, the court stated:

To the extent that a trial judge's pasture is small because he or she is fenced in closely by the appellate courts and given little room to roam in applying a stated legal principle to facts, the operative standard of review approximates what can be described as "de novo." That is, the appellate court closely and regularly redetermines the legal effect of specific facts. But to the extent that the pasture is large, the trial judge has considerable freedom in applying a legal principle to the facts, freedom to make decisions which appellate judges might not make themselves ab initio but will not reverse—in effect, creating the freedom to be wrong without incurring reversal. Only when the trial judge crosses an existing fence or when the appellate court feels comfortable in more closely defining the law by fencing off a part of the pasture previously available does the trial judge's decision exceed the broad discretion granted.

*Id.* at 937–38.

*Pena* provides guidelines for deciding where a particular legal issue should be placed on the spectrum of review ranging from broad discretion, *id.* at 938 (certain evidentiary determinations), to de novo, *id.* ("municipal function" determinations). The facts and law involved in the case at bar compel us to grant the trial court ample pasture, based on two guidelines from *Pena*: (1) "[T]he facts to which the legal rule is to be applied are so complex and varying that no rule adequately addressing the relevance of all these facts can be spelled out"; [7] and (2) "the trial judge has observed 'facts,' such as a witness's appearance and demeanor, relevant to the application of the law that cannot be adequately reflected in the record available to appellate courts." [8] *Id.* at 939.

---

7. In determining the trial court has ample pasture in which to roam here, we point out that the law of breach of fiduciary duty by corporate directors is "highly fact-dependent," like the waiver example used in *Pena*, 869 P.2d at 938. For other examples of highly fact-dependent issues in which courts have applied the "some discretion" standard of review enunciated in *Pena*, see *In re Estate of Beesley*, 883 P.2d 1343, 1347–48 (Utah 1994) (materiality determination); *State v. J.D.W.*, 259 Utah Adv.Rep. 22, 23, —— P.2d —— (Utah App.1995) (entrapment); *State v.*

*Gordon*, 886 P.2d 112, 115 (Utah App.1994) (effect of incorrect testimony); *Trolley Square Assocs. v. Nielson*, 886 P.2d 61, 65 (Utah App.1994) (equitable estoppel); *State v. Teuscher*, 883 P.2d 922, 929 (Utah App.1994) (custody).

8. Regarding this last factor, for instance, the trial court specifically noted in its findings of fact: "In considering . . . the testimony of Mr. Gephart on what has happened in GenBio in general, the Court has serious reservations on the credibility of Mr. Gephart's testimony. Mr. Gephart had

Thus, the standard of review in this case is closer to broad discretion than to de novo.

## B. Fiduciary duty

Having stated the proper standards of review, we first address the correctness of the trial court's selection and statement of applicable law. *See State v. Pena*, 869 P.2d 932, 936 (Utah 1994). The trial court correctly defined the doctrine of corporate opportunity which "forbids a corporate director from acquiring for his own benefit an opportunity that would have been valuable and germane to the corporation's business, unless that opportunity is first offered to the corporation and declined by a disinterested board of directors." *Nicholson v. Evans*, 642 P.2d 727, 730–31 (Utah 1982). The trial court was also correct in determining that breach of fiduciary duty encompasses situations in which corporate directors use confidential information to the corporation's detriment, *see, Glen Allen Mining Co. v. Park Galena Mining Co.*, 77 Utah 362, 382–83, 296 P. 231, 240 (1931) (citing *Trice v. Comstock*, 121 F. 620, 622 (8th Cir.1903)), or urge the corporation to sell an asset to the detriment of the corporation and its stockholders, *see Rocket Mining Corp. v. Gill*, 25 Utah 2d 434, 438, 483 P.2d 897, 899–900 (1971); *Glen Allen*, 296 P. at 241.

Although the trial court's statement of applicable law was correct,[9] we expound on the doctrine of fiduciary duty of corporate directors to add clarity to our analysis. Directors and officers

> are obligated to use their ingenuity, influence, and energy, and to employ all the resources of the corporation, to preserve and enhance the property and earning power of the corporation, even if the interests of the corporation are in conflict with their own personal interests. This duty extends to all of the corporation's assets....

*Nicholson*, 642 P.2d at 730. However, "so long as corporate officers [or directors] act fairly and in good faith, they are not precluded from dealing or contracting with the corporation merely because they are its officers [or directors]." *Runswick v. Floor*, 116 Utah 91, 96, 208 P.2d 948, 951 (1949).

As directors of GenBio during the time in which they investigated buying MRC, Condie and Yarter bear the burden of showing their good faith and fair dealing relating to that investigation. *See Glen Allen*, 296 P. at 240. For instance, they must show (1) they fully disclosed their business with the corporation when necessary, *see Hansen v. Granite Holding Co.*, 117 Utah 530, 542, 218 P.2d 274, 280 (1950); (2) they did not use confidential information to further their own interests, *see Glen Allen*, 296 P. at 240 (citing *Trice*, 121 F. at 622); *Elggren v. Woolley*, 64 Utah 183, 192, 228 P. 906, 909 (1924) (citation omitted); (3) they did not wrongfully withhold ideas from the corporation that would have increased the value of the corporation, *see Nicholson*, 642 P.2d at 730; and (4) they did not promote the sale of the corporation's only valuable asset to the detriment of the corporation, *see Nicholson*, 642 P.2d at 730 (citing *Glen Allen*, 296 P. at 241); *Rocket Mining Corp.*, 483 P.2d at 899–900.

As a director at the time he initiated negotiations to buy MRC, Condie further bears the burden of showing his vote was not necessary to the approval of the "contract" he sought to enforce with the corporation. *See Runswick*, 208 P.2d at 951; *Davis v. Heath Dev. Co.*, 558 P.2d 594, 596 (Utah 1976). However, Yarter bears that burden only if the "transaction ha[d] its inception while the fiduciary relationship [wa]s in existence." *Microbiological Research Corp. v. Muna*, 625 P.2d 690, 695 (Utah 1981); *see also Glen Allen*, 296 P. at 239–40; 19 C.J.S. *Corporations* § 476 (1990). Otherwise, "[w]hen a corporate officer [or director] ceases to act as such, because of his resignation or removal, the fiduciary relationship ceas-

---

substantial influence in the operation of GenBio, but has little, if no, recollection on what has occurred." Further, having reviewed the entire record, we conclude that witness appearance and demeanor played a significant role in the trial court's decision in this case.

9. In our analysis, we do not use the term "corporate opportunity doctrine" used by the trial court, but it is implicit in our discussion of breach of fiduciary duty.

es." *Microbiological Research*, 625 P.2d at 695.

■ According the trial court an ample measure of discretion, we now review its decision that Condie and Yarter's activities did not equal a breach of fiduciary duty. First, we determine whether Condie and Yarter disclosed their business with the corporation as necessary. It is undisputed that their interest in buying MRC arose after the November 1989 board meeting at which the future sale of MRC was generally approved, so they could not have indicated their interest then. However, they did disclose their interest as early as December 1989 or January 1990 when Yarter approached Gordy—GenBio's president at the time—with the idea of buying MRC. Gordy was in regular contact with Gephart and Townsen during that period to report on his efforts to sell MRC. He may even have informed them of Yarter's interest. While Condie and Yarter apparently did not disclose other details of their investigation into buying MRC throughout much of 1990, we conclude the trial court properly exercised its discretion in implicitly holding their nondisclosure was not a breach of fiduciary duty. The investigation was merely preliminary, and, once Condie and Yarter made their offer to buy MRC, the corporation was able to deal with them at arms' length.

■ Second, the trial court found the information Condie and Yarter obtained during their investigation into buying MRC "was not of a confidential nature and was the same information which had been sent to other potential purchasers." GenBio has not properly challenged this finding of fact. *See Pasker, Gould, Ames & Weaver, Inc. v. Morse*, 887 P.2d 872, 875 (Utah App.1994) (requiring party challenging factual findings to marshal evidence in favor of those findings). Thus, the trial court did not exceed its discretion in holding Condie and Yarter did not use confidential information to further their plans to buy MRC in breach of their fiduciary duty to GenBio.

■ Third, we address GenBio's argument that Condie and Yarter wrongfully withheld ideas from the corporation that would have increased the corporation's value. GenBio asserts that Condie and Yarter did not "use their ingenuity, influence, and energy, and . . . employ all the resources of the corporation, to preserve and enhance the property and earning power of the corporation," *Nicholson*, 642 P.2d at 730, as required by law. This assertion is derived from GenBio's current stance that Condie and Yarter should have shared their ideas to increase the value of MRC through new marketing schemes and product lines and through streamlining its operations. While it may be true that MRC could have been made more profitable by implementing Condie and Yarter's ideas, that does not mean it was in GenBio's best interest to keep MRC. Even though MRC was GenBio's only profitable division and had the potential to become even more profitable, Condie and Yarter reasonably could have believed—along with the rest of GenBio's leadership at the time—that MRC should be sold to ensure the future profitability of GenBio through Immunodot development. *Cf.* Utah Code Ann. § 16–10a–840 (Supp.1994) (codifying business judgment rule); *Resolution Trust Corp. v. Hess*, 820 F.Supp. 1359, 1366–67 (D.Utah 1993) (stating business judgment rule creates presumption that "directors acted in good faith and in accordance with sound business principles"); *FMA Acceptance Co. v. Leatherby Ins. Co.*, 594 P.2d 1332, 1334 (Utah 1979) (holding directors who, acting in good faith and with reasonable care, "fall into a mistake" will be held not liable for consequences of actions).

Our fourth point of analysis similarly focuses on a business judgment of Condie, Yarter, and GenBio's other leaders: Did they promote the sale of the corporation's only valuable asset to the detriment of the corporation? We have already determined they reasonably could have believed the sale of MRC would provide the cash infusion necessary to further develop the Immunodot technology thought to be the future of GenBio. Thus, the trial court did not exceed its discretion in implicitly ruling Condie and Yarter did not breach their fiduciary duty in this regard.

■ Finally, we address the legal effect of Condie and Yarter's resignations on the

breach of fiduciary duty determination. Because Condie did not resign before offering to buy MRC, he must show his vote was not necessary to the approval of the "contract" he sought to enforce with the corporation. *See Runswick,* 208 P.2d at 951; *Davis,* 558 P.2d at 596. He has met that burden based on evidence that he did not participate in the November 1989 board meeting at which the future sale of MRC was generally approved.

 However, Yarter resigned before offering to buy MRC. The status of his vote is only important if the inception of the transaction was during the existence of the fiduciary relationship. *See Microbiological Research,* 625 P.2d at 695; *Glen Allen,* 296 P. at 239–40; 19 C.J.S. *Corporations* § 476 (1990). Although Yarter preliminarily investigated the viability of the transaction while the fiduciary relationship was intact, we cannot say the trial court exceeded its discretion in holding he did not breach his fiduciary duty. In this case, the trial court reasonably could have viewed the inception of the transaction as the moment when Condie made the first offer for MRC. Before that, nothing had been done to set plans in motion. Condie and Yarter's prior activities amounted to harmless talk and conjecture. Further, we re-emphasize that the negotiations and dealings between the parties were at arms' length, limiting any possible advantage Yarter could have had as a former officer and director of GenBio.

We therefore conclude the trial court did not exceed its discretion in holding Condie and Yarter's actions did not breach their fiduciary duties toward GenBio.

GenBio's other two contentions on cross-appeal are without merit. It argues Condie and Yarter breached their obligation of good faith and fair dealing. Our fiduciary duty analysis effectively disposes of this issue. *Cf. Resolution Trust Corp.,* 820 F.Supp. at 1366 (refusing to address breach of fiduciary duty claim as duplicative of negligence claim). We have also reviewed GenBio's request for costs and attorney fees under Utah Rule of Appellate Procedure 33(a) and find it to be without merit; thus, we decline to address it. *See State v. Carter,* 776 P.2d 886, 888 (Utah 1989) (stating appellate courts "need not analyze and address in writing each and every argument, issue, or claim raised").

## CONCLUSION

We conclude the written and oral correspondence between Condie and Gephart did not constitute a contract. Further, the trial court did not exceed its discretion in holding Condie and Yarter did not breach the fiduciary duties they owed GenBio. Accordingly, we affirm.

BENCH and GARFF, JJ., concur.